TUCKRR, Judge.
The principal points in this cause are,
1. Whether a native of Ireland, born before the American revolution, and continuing to reside in his native country, until after the war, and had never been duly admitted a citizen of this state, or of the United States, is capable of *inheriting lands in Virginia, since the treaty of peace in 1783, and before that of 1794?
2. Whether parceners can recover in ejectment unless all the parceners join?
3. Whether, as between the present parties (the defendant being the widow of the intestate, under whom the plaintiffs claim as heirs) the plaintiffs are entitled to recover those lands, of which they have not shewn the intestate, and those under whom he claimed, to have been possessed for twenty years before his death?
As to the first point:
It is agreed, on all hands, that the plaintiffs, at the time of their birth, were capable of taking lands by descent, or purchase, within this country, although they were born in Ireland, and had never left if until the revolution.
This capacity to inherit, purchase and hold lands, was one of those reciprocal rights, which every subject of the British empire, wheresoever born, or wheresoever residing, derived to himself as a birthright, flowing from the mutual and reciprocal benefits which all were entitled to, as members of the same government. Nor do I conceive it to be at all material, whether this right were deduced from the common bond of allegiance to the person, or to the politic character of the prince: of whatever nature the bond might, by the ingenious sophisms of the learned in the law, be supposed to be, the reciprocal rights of the subjects of the different countries subject to the British crown, were precisely the same. This reciprocal right being once admitted, the question is, Whether it has by any subsequent event been, destroyed?
A distinction was noticed at the ba,r between the vested rights, and such as were merely possible; and it was contended, that although the former might be protected, either by the treaties with Great Britain, or by the act of 1784, ch. S3, concerning confiscations from British subjects, yet the latter, being as it were in nubibus, could not derive any benefit or security from either. But I can discover no ground . for *this distinction, there being according to my apprehension, the same reason, that the heir in fee simple should succeed to the estate of his ancestor, as that the heir in tail should:. Nor can I perceive any more cogent reason in favour of a remainderman, or reversioner, whose enjoyment of the estate is postponed until the death of the present occupant, than might be advanced in favour of the immediate heir of him to whom the fee simple actually belongs. The right of succeeding to the enjoyment of lands upon the death of the present occupier, appears to me to stand upon the same footing in all those cas,es. The same law and the same policy which would protect, or defeat the one, would therefore, I apprehend, protect or defeat the other. And, although the law, in case of a de.vise to an alien, might suffer him to enter, and to hold the lands until office found, yet whenever an office is found, he is from .that moment as incapable of holding, as an alien next of kin is of taking by descent. The only distinction between the two cases is, that, in the former, the commonwealth upon office found shall take the land by way of forfeiture; in the latter, (if there be no other heir than the alien,) she shall take it by way of escheat. But the capacity to hold the lands (or rather the incapacity to hold them) is the same in both cases. It matters not then, I conceive, whether the right of succeeding to the possession of lands, and of holding them after-wards, be claimed by an alien, or other person, as heir, in fee simple, or in fee tail, or as remainderman, or reversioner. Ror “Hereditas est successio in universum jus quod defunctus antecessor habuit, ex quacunque causa acquisitiones vel succession^. ” Bract, lib. 2, cap. 29; 7 Co. 10. I shall therefore proceed to enquire, whether the plaintiffs in this cause have, by any event, been deprived of that right which they once had to inherit lands within the precincts of this commonwealth?
This, if it be so, must have happened, 1. By forfeiture, for some crime, or offence, committed against the state; which is not pretended. 2. By the mere act of separation '^between this country and Great Britain. 3. By some act of the general assembly of this commonwealth.
That the plaintiffs were not deprived of *918 their former capacity to inherit lands in Virginia by the mere act of separation between the two countries, has been insisted on, upon the authority of the cases adduced by sir EJdward Coke in his report of Calvin’s case; and particularly from the analogy between the cases of the separation of Normandy from England, and that of Virginia from Great Britain, as cited from Bracton in 7 Co. 20, b. 27, b. ; where it is said, “that all those, who were born under one natural obedience, whilst the realms were united under one sovereign, should remain natural born subjects, and not aliens;” and therefore able to possess and purchase lands in England. 7 Co. 20, a.
To this, two objections were made at the bar. 1. That this dictum of sir Edward Coke is wholly extrajudicial, as not being within the question in Calvin’s case. 2. That it was probably not by the common law, but by virtue of some ancient statute that the people of Guienne and Normandy were held to be capable of inheriting and holding lands in England. The first of these objections is admitted. But to the second, it may be answered, that the statute cited in 7t,Co. 20, as of the 13 Hen. 4, (which would have been in the 13 Hen. 4, 1322, according to Hume’s Hist. Engl.) whereby it' was declared that those of Guienne, but not of Normandy, were adjudged and declared to be no aliens, but able to possess and purchase lands in England, was made more than a century after the loss of Normandy, which happened early in the reign of king John, which was in 1204; Hume’s Hist. Engl.; and more than a century after the death of his son Henry 3, in whose reign Bracton is supposed to have written. 7 Co. 20; 1 Hal. 77. And from the death of Henry 3, to the 39 Edw. 3, when the first of those statutes passed, was considerably more than half a century, to wit, about 90 years. So that Bracton’s authority could not have been founded upon any of those statutes, as was supposed by the defendants’ counsel.
*The statute de prasrogativa Regis, 17 Edw. 2, ch. 12, with Staunford’s comment upon it, dedicated to sir Nicholas Bacon, in the year 1S48, more than half a century before the decision in Calvin’s case, 6 Jac. 1. A. D. 1609, will enable us to decide whether, what Bracton says is founded upon the common law, or not.
The statute declares, “That the king shall have escheats of the lands of Normandy, saving the service appertaining to the chief lords of the fee. And this also is to be understood where any inheritance descendeth to any that is born in the parts beyond the sea, whose ancestors were, from the time of king John, under the allegiance of the kings of Erance, and not of the kings of England, as late it happened by the barony of Monmouth, after the death of John de Monmouth, whose heirs were of Britanny, and other places.” On which Staunford remarks, “By this it should appear, that, at this time, men of Normandy, &c. were inheritable within this realm, as well as Englishmen, because that they were sometime subject unto the kings of England, and under their dominion, until king John’s time; and yet, after his time, those men (saving such whose lands were taken away for treason) were still inheritable within this realm, till the making this statute. And, in the time of peace between the two kings of England and Erance, they were answerable within this realm if they had brought any action for' their lands and tenements, as it doth plainly appear by Bracton in his fifth book, in the title de exceptione quia alienígena; for these be his words, ‘Est autem alia exceptio quae corn-petit teneti ex persona petentis propter defectum nationis, quae dilatoria est, et non peremit actionem. Ut si quis alienígena qui fuerit ad fidem regis Eranciae, et actionem instituit versus aliquem qui fuerit ad fidem regis Angliae, talis non respon-deatur, saltern donee terras sint communis, nec etiamsi Rex ei concepit specialiter placi-tare, quia sicut Anglicus non auditur in placitando aliquem de terris et tenementis in Francis, ita non debet alienígena et Franci-gena qui fuerit ad fidem regis Francis audiri placitando in Anglia,’ *i. e. There is another exception which the tenant may have, on account of the person of the demandant, for defect of nation, which is dilatory, and does not take away his action. As if an alien under the allegiance of the king of France should bring an action against one under the allegiance of the king of England, such an one may not be answered, at least until there shall be peace between the two countries, not even although the king shall have granted him a special license to sue; because, as an Englishman is not heard in pleading in Erance, so neither ought an alien, and Frenchman born, under the allegiance of the king of France, to be heard in pleading in England.” Upon which Staunford remarks, “Note, here he saith that this exception is but dilatory, and not peremptory; which proveth that he shall have his action at another time; that is to say, in the time of peace. And also he saith after, donee terras sint communes; which is as much as to say, until such time as there is peace between Erance and England.” He proceeds afterwards to say, that if the heir be a Frenchman, and the two realms at war, the widow’s right to demand her dower shall be suspended so long as the realms are at war; but that this exception is not peremptory, but after the two realms are again at peace, she shall have her dower. And the reason given for this is, because during the war the heir himself being a Frenchman, was incapable of suing; and if a woman brought a writ of dower against any other than the heir, he was not bound to answer.
This comment upon the statute, and upon the passage in Bracton, which was relied on in Calvin’s case, proves most clearly, that by the common law, as understood both in the time of Bracton and Staunford, the antenati of England and Normandy were inheritable to each other in both countries, after their separation: and it would seem both from the words of the statute, and from the comment upon it, that their heirs were not barred, until the making of that statute, which gave, to the king, the escheats of the lands of those who were born beyond sea, whose ancestors *919 were, *from the time of king' John, under the allegiance of the kings of France, and not of the kings of England; upon which part of the statute, Staunford makes the following remarks: “The words of this branch be also in the copulative, that is to say, that the ancestor must be of the allegiance of the French king, and that the heir of the said ancestor is born in the part beyond sea. I put the case, that the ancestor were of the allegiance both of the one king and the other, that is to say, the French king, and the English King, Whether is this within the compass of the statute? For Bracton saith, Quod sunt aliqui qui sunt ad fidem utriusque, sicut fuit W. comes Marciscallus & Manens in Anglia, et Michael de Seins, Manens in Franciaa, et alii plures; et ita tamen quod si contingat Guerra moveri inter regis, remaneat personaliter qnilibet eorum cum eo cui fecerit legiantiam.’’ Whereby, says Staunford, “it should appear (or as sir Edward Coke, 7 Rep. 20, b. understood him, it is apparent without question) “that if such as were in allegiance to both kings (that is, born under the allegiance of the one, but after the separation of the two countries, living, or holding lands within the dominions of the other, as I understand it) the king should have no escheats of their lands. For the words of the statute be, not only ad fidem regis Franciae, but also et non ad fidem regis Anglias.” This comment, therefore, serves to explain what Bracton says, concerning such as were ad fidem utriusque; so as either to mean the antenati in both countries, born before their separation, or such as had lands in the dominion of that prince in which he did not reside; but yet did homage and owed services to him in respect to those lands, as sir Matthew Hale supposes. 1 Hal. PI. Cor. 68, 69. And if this be the true meaning of the passage, as I strongly incline to believe, it destroys the objection made by the appellee’s counsel, that the present plaintiffs never owed allegiance to the state of Virginia ; for the whole context shews, that it is the ancestor, and not the heir, who was supposed to be ad fidem utriusque; and, in the present case, Robert Read, *the intestate, as a citizen of this commonwealth, born in Ireland, must have owed allegiance, first to the king of England, and secondly to the commonwealth of Virginia. So that he was clearly within Bracton’s description of those Frenchmen born in France, who were ad fidem utriusque, et semper fuerunt ante Normanniam deperditam, et post, et qui placitant hie et ibi, ea ratione quod sunt ad fidem utriusque.
The mere act of separation between this country' and Great Britain did not therefore, according to the principles of the common law, deprive the plaintiffs of their right to inherit and recover lands in this country after the conclusion of the peace between the United States and Great Britain.
But it has been objected, that this part of the common law was not adopted in this commonwealth.
Ingenious, and even subtile, as the arguments in support of this proposition were, I cannot find that, in a legal question, they ought to have any weight, No man I trust would be more jealous than I should of the danger of preserving any part of the theory of monarchy in our commonwealth ; but the rights of individuals, upon whatever theory originally founded, after having settled into the known law of the land for six centuries, in England, and after being considered in a similar light in this country, from its first foundation, ought not to be shaken, unless the imperative voice of the constitution, or of the legislature, shall compel it to be done. The adoption of the common law, by the ordinance of the convention, is not special, as was contended at the bar, but general. Statutes of England, indeed, were adopted specially, but we are now considering a branch of the common law.
Having satisfied my own mind that this case is provided for by the common law, as adopted by us at the revolution, I deem it wholly unnecessary to go into the en-quiry what the law of nations would have decided in this case, had the common law been silent upon it. Because, in all questions concerning prope'rty in lands, the law of the land must supersede *the general law of nations. And the common law of England being the law of the land in this case, (unless repealed by the legislature), it would be time lost to enquire what the law of nations might have determined, had we no other to resort to. But were I disposed to indulge myself in a political disquisition on this occasion, I think it could be made to appear that we professed not to war with the people of England and Ireland, but with their king and his armies ; and whilst we execrated the latter as enemies, we still remembered the former as brethren, whom, with the return of peace, we should always be disposed to embrace again, as such.
During the American war, several acts passed concerning escheats and forfeitures from British subjects, viz. May 1779, ch. 14; October 1779, ch. 18, 39; October 1784, ch. 58; the operation of which I deem it unnecessary to enquire into on the present occasion, as I consider it confined to such estates, as at or before the passing of the act of May 1779, ch. 14, were the property of British subjects; observing only by the way, that the preamble of that act did not, I conceive, alter the common law, although it gives a strong clue to the mind of the legislature, not only in that act, but in one of the same session, which is only to be found in the acts of that session, printed about the same time: a transcript of which may be seen in the appendix to 2 Tuck. Black. 55.
That act, (May 1779, ch. 55.) after declaring who shall be deemed citizens of this commonwealth, has these emphatic words, “and all others not being citizens of any of the United States of America, shall be deemed aliens.” This act, together with that of the same session, entitled, ‘an act concerning escheats and forfeitures from British subjects,’ leaves no doubt in my mind, that it was the intention of the legislature, at that time, to enforce the common law doctrine, concern *920 ing aliens, with its utmost rigour, and to repeal that part of the common law which permitted the antenati of two countries separating from each other, not *only to hold their lands, as before the separation, but even to inherit lands in that part of the territory formerly united, in. which they did not reside. And all the subsequent acts passed during the war, with a view to his subject, manifest the same disposition in the legislature.
In November 1782, .the provisional articles of a treaty of peace were concluded at Paris, and not long after were published in this country. In September 1783, the definitive treaty of peace between the United States and Great Britain was concluded; and on the 20th of October following, the legislature of this commonwealth assembled, and it is probable that the treaty of peace was published here, about the same time as the .legislature, during that session, passed an act for the admission of emigrants, and declaring their rights to citizenship: whereby, among other things, they expressly repealed the above mentioned act of May 1779, ch. 55, entitled, “an act declaring who shall be deemed citizens of this commonwealth;” and by that repeal, as I conceive, restored the antenati subjects of Great Britain, to all the rights which they were entitled to claim under the common law. That such was the intention of the legislature, I infer, because the substance of the enacting clauses in both acts, (except so far as, by the former, “all others are declared to be aliens,”) is nearly the same; and the omission of that clause, is a manifestation of a change in the will of the legislature in regard to those who would not have been deemed aliens, after the conclusion of peace between the two countries, but for that act. And here, it may be proper to remember that, at that time, the bare repeal of an act repealing a former law, was held to revive the former law, according to the rule of construction then universally adopted in our courts.
But this is not the only ground upon which I draw this inference. By the 5th and 6th articles of the definitive treaty of peace with Great Britain, it was manifestly the object of both parties to provide not only against future confiscations, or losses to individuals on account of the part *which they may have taken in the revolutionary war, but also for the restitution of all estates, rights and properties which even may have been confiscated. -This latter stipulation, so far as it might respect the vested rights of purchasers of confiscated estates, was impracticable without a violation of the principles of our constitution ; but the legislature, by their act of 1784, ch. 53, declaring that no future confiscations should be made, manifested their disposition to carry into effect such parts of the treaty as could, without a violation of the principles engrafted in -the .very frame of our government, be carried into execution; and that act operated as a release of the commonwealth’s right to all the lands belonging to British subjects, in which no inquest of office had been found. The effect of this release, on the part of the legislature was, that the persons to whom the lands should then belong, (whether the same persons to whom they belonged at the declaration of independence, or their heirs, or assigns; or remaindermen, or rever-sioners, to whom the right of possession may have fallen during the war,) might enter, and hold the same in the same manner that they might have done, if the war had never been commenced. What then is that act, but a recognition of the right of the antenati subjects of Great Britain, to succeed to, and hold the lands of their ancestors in this country? Bor, let me ask, whether, after this act of 1784, ch. 53, (which operated, I conceive, as a complete repeal of the act of May 1779, ch. 14, concerning escheats and forfeitures from British subjects, so far as related to all lands concerning which no inquest of office had been found,) it would not have been deemed an absolute violation of the 6th article of the treaty, declaring that no person shall, on account of the part which he may have taken during the war, if a person claiming lands as heir, by virtue of a descent cast during the war, had been told, “we will not confiscate your lands on account of the part you may have taken in the war, but we will seize them as having escheated to the commonwealth, because you did not take *part with us.” Surely such a conduct would neither have been ‘consistent with justice and equity, nor with that spirit of conciliation which, on the return of peace, should universally . prevail. ’ Treaties, say the writers on the law of nations, are to receive a liberal construction, and such a one as may be most beneficial to the parties, and their subjects, respectivelj. By the treaty in question, a civil war had been concluded; the right of separation and independence acknowledged; and a general amnesty and oblivion of all animosities seems to have been contemplated by both parties: Beneficial stipulations were insisted on, and agreed to on both sides; and to disarm the resentments of each nation, not only against innocent individuals, but even against those who might have promoted and augmented the horrors of war, was manifestly the object of these articles of the treaty. Under these circumstances, I conceive we are bound to give to the treaty the most liberal construction, and not interpret favourably in behalf of obnoxious characters, because the words admit of no doubt, and unfavourably towards innocent individuals, whose cases might not fall within the very words, although unquestionably within the spirit of the compact.
Upon these grounds, I am of opinion, that the plaintiffs in this cause are capable of succeeding to the inheritance of Robert Read, the intestate, and of holding the same, notwithstanding the separation between the two countries: and that they are well entitled to maintain an action for the recovery of the same.
I shall now consider the second point.
By the special verdict, found in this case, it appears, that Robert Read, the intestate, had two sisters of the half blood ; and several nephews and nieces of the whole blood, who, if in esse at the time of his death, *921 and born before the separation of the two countries, would have been entitled to share his inheritance with the present plaintiffs, as parceners; and the question is, Whether, if they be so entitled, the present plaintiffs can maintain this action, in which the other ^parceners have not joined, inasmuch as all the parceners make out one heir?
This, as a general question, is one of infinitely greater importance that the former. Since in almost every case of a disputed title that may hereafter occur, the parties plaintiffs are likely to be parceners, so long as our present course of descents shall prevail.
The counsel for the defendant, by whom this point was made, relied on Co. Ritt. 164, and Salk. 389, to prove that all the par-ceners make but one heir; and therefore that in all actions, concerning their lands, they must join and be joined. And this, as a general rule, seems to be proved by what sir Edward Coke • there says, that where they are demandants, if one of them be within age, the parol shall demur against them both, inasmuch as they have but one right. And again, that as they make but one heir, so they have one entire freehold, as long as the land remains undivided, in respect to any strangers praecipe. Ibid. 164. And this is agreeable to Rittle- ■ ton, sect. 313, if two parceners be disseised, they have in their two names one assize, and not two assises; and Co. RitR 180, b., jointenants must jointly plead, and jointly be impleaded by others; which property is common between them and copar-ceners.
But to this rule there seems to be some exceptions; for if there be two parceners of lands, and one enters and claims the whole, and is disseised, she alone may maintain an assize against a disseisor. Jenk. Cent. 42. And in the case of a gift in frank marriage to one daughter, if the father die seised of other lands in feesim-ple, leaving another daughter, she may enter into the same, (and consequently may have an assize, or other proper action to recover the possession, if need be) and occupy them to her own use, unless the husband and wife’will put the lands given in frank marriage into hotchpot; and the donees in frank marriage must, in this case, do the first act; and in the mean time the whole feesimple lands descend to the other daughter. And sir Edward Coke cites Fleta to shew, that if the tenant ^should plead in such a case, that the demandant ought not to be answered, because A., one of the daughters or sisters of him from whom the lands descended, had a right to partition, the demandant might reply, that A. held a certain part of the common inheritance by gift in frank marriage, and would not put it into hotch-pot. Co. Ritt. 176, b. Which proves, that although there might be one or more daughter, or sister, of him from whom lands descend in parcenary, they are not necessarily all parceners; but that one or more of them may, in this case, succeed to the inheritance which has descended, without the rest; and consequently may sue and be sued in respect to their inheritance, without them. And herewith Rittleton, sect. 268, 269, 273, seems to agree. And sir Edward Coke remarks, that it is worthj of observation, that after this putting into hotchpot, and partition made, the lands given in frank marriage are become as the other lands which descended from the common ancestor; and of these lands if the donee in frank marriage be impleaded she shall have aid of the other parceners, as if the same lands had descended. Co. Ritt. 177, b. And here we may notice also what Rittleton, sect. 269, says, That the sister, to whom lands are given in frank marriage, shall be intended to be sufficiently advanced, and contented therewith, unless she will put her lands into hotchpot; and therefore the whole shall descend to her other sister; which agrees precisely with the principle established in our law of descents, (1794, ch. 93, sect. 17,) that where any of the children of the intestate, or their issue, shall have received from the intestate in his lifetime any real estate by way of advancement, and shall choose to come into the partition with the other parceners, such advancement shall be brought into hotchpot with the estate descended. Now, put the case that one or more of the children of a person dying intestate should have been thus advanced by him in his lifetime, would it not be a great-inconvenience if the others could not be admitted to sue for the lands which may have descended to them, unless the children thus advanced would join in the action for the recovery thereof.
*The importance of this question, in a country where all descents are in parcenary, will more fully appear from considering the several remedies which the common law gave to parceners in respect to their lands; the applicability of those remedies to the nature of estates in this countrj; and some of the ordinary proceedings had in pursuit of those remedies, a concise sketch of which only will for the present be sufficient.
The remedies against a stranger were by an assize of mort d’ancestor, or by a prascipe quod reddat, founded either upon the seisin of their common ancestor, or of the par-ceners themselves, according to the nature of their case. The remedies between themselves were either by writ of partitione facienda, by writ of rationabili parte, or by an assize of nuperobiit; or by an assize of novel disseisin, in case of an actual disseisin.
The assize of mort d’ancestor lay, where, upon the death of the ancestor who was seized on the day of his death, a stranger entered, either by abatement, or by dis-seisin on the death of the ancestor, and kept possession of the land, Fitz. N. B. 195, (433 of the quarto edi.) ; but it was always held that where those lands were de-viseable by a man’s last will, by the custom of the place, there an assize of mort d’ancestor did not lie, Ibid. 196, (436) : And upon this ground, judge Blackstone is of opinion that no assize of mort d’ancestor can be brought of any lands in England, since the statutes by which all lands are deviseable there, 3 Black. Com. 187; and for the same reason this writ will not lie in this country.
*922 The prtecipe quod reddat lay upon the seisin of the ancestor in his lifetime, if he were disseised before the day of his death; and died leaving two or mdre daughters, or their issues, and no son; the whole of the daughters, or their issues, making but one heir to their common ancestor, must have joined in the praecipe quod reddat. Co. Bitt. 164, a. And if they did not, and this were pleaded in abatement, the writ should abate. But here we must remember the *case before mentioned, that if one of them had been advanced by gift in frank marriage, and would not put her part into hotchpot, the writ should not abate. Co. Bitt. 176, b. By which it appears that, even in a writ of right, the not joining all the parties in the writ is matter proper to be pleaded in abatement; and that the daughter to whom the land descended alone was not constrained to wait until her sister, who was advanced in frank marriage, should choose to put her lands into hotchpot with the lands descended, but that she, who was not advanced, might bring her action alone.
The writ de partitione facienda lay only between such as held lands together and undivided; and therefore sir Edward Coke informs us, that if one parcener disseised another, during the disseisin, a writ of partition does not lie; for that, non tenent insimul et pro indiviso. Co. Bitt. 167, a. In this case it seems to be the opinion of sir Edward Coke that the parcener, who was disseised, might bring an assize, and recover her seisin of the lands, to hold the same in common, as before the disseisin, until partition of the lands be made. Co. Bitt. 167, b.
If the ancestor died seized, and one sister entered into all the lands, and deforced her other sisters, they might sue either a writ de rationabili parte, or an assize of nuper obiit, at their election. But if the ancestor did not die seized, then the writ de ration-abili parte only laj, and not the Writ of nuper obiit. Eitz. N. Br. 19. But inasmuch as the writ de rationabili parte must be directed to the lord of whom the lands are held, Eitzh. N. Br. 19, it would seem that this -remedy could not be had in Virginia: And since the assize of nuper obiit does not lie, unless the ancestor die seized, a great defect of justice might happen if no other remedy could be founded in that case.
It is a rule of law, that if two, or more, have a joint right to a thing, they must bring a joint action for the recovery thereof, Co. Bitt. 164, 180; and if two, or more, who have a joint right of action have not all joined in an action which may be brought, the defendant may plead this in abatement. *4 Bac. Ab. 661. It is indeed in the power of one or more persons who have a joint right of action to commence a suit in the name of all in whom the right is: but notwithstanding a plea in abatement would be thereby prevented, it would still be in the power of any one of them by neglecting to appear, or refusing to proceed afterwards in the suit to render it fruitless. Ibid. To prevent, therefore, the inconvenience and the failure of justice, which would be if all the other persons having a joint right of action should be precluded, by the negligence or collusion of one, from having the effect of a suit, the law has provided, that if one of the persons, in whose name a joint action is commenced, do not appear, or do, after appearance, make default, the other may have judgment to sue alone; or in other words, judgment of severance, after which the other plaintiffs may proceed in the suit. Ibid. 661. And this proceeding is thought so necessary, that it is said, If two of four jointenants disseise the other two, the two who were disseised may bring an assize in the name of the four, and may have judgment of severance against the two dis-seisors. Bro. Sum. & Sev. pi. 17; 4 Bac. Ab. 662. And if two or more parceners have joined in' an action for recovering the estate of their ancestor, judgment of severance may be prayed, because they could not avoid joining in such action. 4 Bac. Ab. 662. And this judgment of severance may be given in an assize and in all real actions ; and also in all mixt actions. Ibid. 663. And if two parceners join in a real action, and one of them die after judgment of severance, the suit abates. 10 Co. 134.
The inconveniences of these ancient forms of proceeding is obvious. For if all the parties were not named in the writ, this was good cause for pleading in abatement: If all were named, théy must be summoned and severed, unless they had all original^' agreed to join in bringing and prosecuting the suit: And after this was done, if one of the parties should happen to die, the suit, we see, abated.
*To remedy these and other numberless inconveniences, the writ of ejectment was devised; which, and its nominal parties, as we are told by the unanimous opinion of all the judges, are judicially to be considered as the fictitious form of an action really brought by the lessor of the plaintiff against the tenant in possession ; invented under the control and power of the court for the advancement of justice in many respects, and to force the parties to go to trial upon the merits, without being entangled in the nicety of pleadings on either side. 1 Burr. 668; 3 Black. Com. 206. And we are further told that, although a writ 'of ejectment is not an adequate means to try the title of all estates, as where no entry can in fact be made, (as in the case of an advowson, a rent, a common, or other incorporeal hereditament; or where the entry of him that hath right is taken away by descent, discontinuance, twenty years dispossession, or otherwise,) yet it is a method of trying the title to lands, which is now universally adopted in almost every case. And that it is founded on the same principle as the ancient writs of assize ; and hath succeeded to those real actions, as being infinitely more convenient for attaining the ends of justice. 2 Black. Com. 20S, 206.
Now we have seen that, of „the ancient common law remedies, the assize of mort d’ancestor, and the writ of rationabili parte are neither of them adapted to the tenure of lands in Virginia; and that the assize of nuper obiit does not lie, unless the ancestor dies seized. And where one coparcener *923 disseises another, so long as the disseisin continues, a writ of partition does not lie. So that a great defect of justice may happen if the courts should incline, in any degree, to narrow the beneficial operation of the fictitious proceedings in ejectment. The legislature have manifested a strong disposition to favour this mode of proceeding, by declaring that after issue joined, in an ejectment, on the title only, no exception of form, or substance, shall be taken to the declaration in any court whatever. Virg. Laws, 1794, ch. 74, sect. 35. Which seems to be intended to make the '^remedy coextensive with the right, however that right may happen to be modified.
A single instance may shew what circuity and perplexity may be avoided by a beneficial use of the remedy by ejectment, in lieu of the old remedj' by assize. If two of four jointenants disseise the other two, (as before mentioned,) the two who are dis-seised may bring an assize in the name of the four, and have judgment of severance against the two disseisors; and then may proceed separately against them. All which circuity and seeming absurdity, (in that the same persons must be made both plaintiffs and defendants in the same suit,) may be avoided, I apprehend, by simply admitting that one jointenant may maintain an ejectment against his fellow, whether the fictitious demise be laid to have been made jointly or severally. And the recovery in either way, I presume, would not in the least affect the title of the parties. For the moment that the plaintiff was reinstated in his possession, they would be jointenants of the possession again, as before the dis-seisin, as well as jointenants of the title. Nor can I see any good reason why the same beneficial course may not be extended by this means both to coparceners, and tenants in common.
The rule of law, however, is, as I before stated it, that where two or more have a joint right, they must join in the action for the recovery thereof. But although this is regularly true, yet if they do not all join, I conceive it ought to be pleaded in abatement. 4 Bac. Ab. 661, and the authorities there cited. And the case of Child v. Sands, in error, is a very strong case to shew, that if it be not so pleaded, although it be afterwards specially found in the verdict, it shall not be error. In that case, the plaintiff Sands, declared that he was owner of a ship laden with divers goods, wherein he had a fifth part to his own share: and that the defendant caused her to be arrested in the court of admiralty, &c. : upon not guilty pleaded, there was a verdict and judgment for the plaintiff in the court of common pleas; and now, upon a writ of error brought, it was adjudged that *all five proprietors, being joint owners, should have been joined in this action; but this being not pleaded in abatement, as it should have been, all is now well. For though it appears by the declaration, that there were four others jointenants of these goods, with the plaintiff, yet it does not appear but they are dead; and then Sands alone, is entitled to the action: and wherever jointenancy is pleaded in abatement, the life of the other jointenant is averred in the plea ; otherwise the plea is ill, for which 1 Saund. 29, is cited. See 1 Salk. 32. And the reporter adds a note, whether they were jointenants or tenants in common, either way the action survived: and the judgment was affirmed. Now in the present case, it is not found that the sisters and other relations of Robert Read, who are mentioned in the verdict, were alive at the time of the death of Robert Read, and there is as much reason to presume that they may have been dead, or were dead at the time of the suit brought, as that the jointenants of the goods in the case of Sands and Child were dead: nor is it found, that, if living, they were born before the separation of the two countries; nor does it appear, by the verdict, but that they may have received some advancement from Robert in his lifetime, with which they were content; and therefore would not put their part into hotchpot, and join in the action. • So that it does not appear, from this verdict, whether they ought to have joined in the action, or not: and the court will not intend that they ought to have done so, after a verdict, as in the case of Sands and Child.
But it will be answered, that, in that case, the defendant had it in his power to have pleaded, that there were others who ought to have been joined in the action, in abatement; but that no plea in abatement can be admitted in ejectment; and therefore that whatever would be a good plea in abatement may be taken advantage of after the verdict, if the matter appear upon the face of the verdict.
This objection is certainly very plausible: But if permitted to prevail, I incline to believe that the beneficial effects *of the proceeding by ejectment, will be greatly narrowed. Many reasons occur why it ought not to prevail. Until partition he made between parceners, jointenants and tenants in common, each parcener, &c. has, I conceive, a right of entry into the whole of the lands, descended, or held in jointenancy, or in common; and not merely a right to enter into his propor-tionable part only; and his entry and possession (except in case of an actual ouster, disseisin, or deforcement), shall enure as the entry and possession of the whole that have title with him. Why then may he not recover possession of the whole, as well as enter upon the whole? In the case of coparceners, this seems to be more reasonable in this country, because our law has extended the right of inheritance in par-cenary to so many persons, that many times all those who are entitled to partition may not be known ; and if pendente lite one of the parceners named in the suit should die, and his share descend to several others, it will be impossible for parceners in case of deforcement, or disseisin, ever to recover possession of their ancestor’s lands, if the writ must abate whenever such an event happens, and a new suit be brought; lest it should appear by the verdict that there were others who ought to join in the action. If two parceners join in a real action, and one of them die after judgment of severance, the action abates. 10 Co. 134. And *924 ■the reason given is, that the survivor, who upon the death of the other became entitled to the whole, may have an original writ to recover the whole; and this notwithstanding the alteration happened by the act of God; because the law will not suffer a party to recover under an original writ, the words of which are false, or unfit for his case. 10 Co. 134; 4 Bac. Ab. 66S. On the other hand, it would seem that no inconvenience can arise from one or more coparceners recovering the whole of their ancestor’s estate to them descended against án abator, although there be other coparceners with them, who do not join in the action. For whenever one or more have recovered, as I have before said, the possession of those who have thus ^recovered alone ' (except in the case of an actual ouster) gives possession to all the others. Hob. 120; J'enk. Cent. 42. And this is further proved by 'Co. Litt. 164, a. ; where it is said, If the issues of two coparceners which are in by several descents be dis-seised, they shall join in an assize; but, in the same Case, if the two daughters had been actually seised, and had been dis-seised, after their deaths the issue shall not join; because several rights descended to them from several ancestors; and yet, when they have severally recovered, they are co-parceners. And it is worthy of observation, says sir Edward Coke, that where jointen-ants, or coparceners, have one and the same remedy, if the one enter, the other shall also enter. As if two jointenants, or co-parceners, join in a real action, where their entry is not lawful, and the one is summoned and served, and the' other pursueth and recovereth a moiety, the other jointen-ant or coparcener shall enter, and take the profits with her, because their remedies were one and the same'; and even if their remedies were several, when both have recovered they are coparceners again. Co. Litt. 364, a. b., 188, a. 164, a. It seems, therefore, much more reasonable that although all the parceners do not join, they should recover the ‘ whole of the lands descended against an abator, than that the abator should have judgment against them, if it should appear by the verdict, that there are some who have not joined in the action, who might have joined if they would. Since the possession of those who recover will be, in law, the possession of all who have right to hold the lands with them; and they may make partition between them without the trouble of another suit against the abator, for the proportion of'those who do not join in the action.
I will here mention another question which occurred to my mind in this case. The defendant is found to be the wife of the deceased Robert Read; and, at first, I doubted, whether the plaintiffs could recover more than two thirds of the premises, she being entitled to dower therein. But I find it said in 6 Co. 30, b., That if a woman who hath title *of dower dis-seise the tenant of the land, she cannot endow herself by retainer. Therefore in case the plaintiffs should be entitled to judgment in their favour, it should seem the judgment must be for the whole; and she may afterwards bring her writ of dower unde nihil habet, for her dower therein.
But notwithstanding all that I have said upon this second point, upon which I do not mean to give an opinion at present, I ám satisfied that, upon this verdict, there cannot be a judgment in favour of the plaintiffs. The title to the. half acre of land in Staunton is admitted to be sufficiently found. The title to the 300 acres conveyed by Beverley to Miller; by Miller to Christian; by Christian to Fleming, and by Fleming to Read, is also, I presume, sufficiently found to enable the parties to maintain an ejectment. But the'demise is laid for 749 acres of land; of which 449 acres were sold by Robert Beverley (whose title is not traced) to W. Fleming, in 1765, who sold to Read, who died in 1787; and, upon his death, the defendant entered into the possession of the whole lands, claiming the same, I presúmelas his next heir, although she now sets up.a title under the commonwealth. If the five years and a half, excepted out of the operation of the act of limitations during the war, be deducted from this period, there will not more than seventeen years remain; which is not enough to authorize the plaintiffs to maintain an ejectment upon the possession only of their ancestor under whom they claim. But the verdict finds for the plaintiffs their term yet to come in the whole of the premises laid in the declaration, if the law (upon the whole matter found in the verdict as I understand it) be for them. Now, upon this point, it does not appear whether the law, as to these 449 acres, be for them, or against them. For if Beverley were a dis-seisor, and immediately, upon the disseisin, had conveyed the lands to Fleming, who Conveyed to Read, the law would not be for the plaintiffs as to. this land. . But if Beverley’s title were a legal title, and his possession a legal possession, then the law would be for them. *And' since the verdict makes no distinction as to these lands and the others, and the judgment must follow the verdict, that being uncertain, no judgment can be given thereupon, but a venire facias de novo must, I conceive, be awarded for that cause.
I am therefore of opinion, that the judgment should be reversed; the verdict set aside; and a venire facias de novo awarded.
ROANE, Judge.
The principal question arising out of this special verdict is, Whether the lessors of the plaintiff,' who were born in Ireland, prior to the year 1770, and who did not become, citizens of this commonwealth, until after . the descent of the lands in question, were, at the time of such descent, disabled to take and hold lands within this commonwealth, and to bring any real or personal action concerning them. Such being the disabilities under which an alien labours by the common law, the question may be more succinctly stated to be, whether, in respect of the lands in question, the plaintiffs are to be regarded as aliens, or not.
I will consider this question :
1st. In relation to the doctrines of the common law of England, as handed down to us in the reports and treatises on the *925 subject, with no other variation than what arises from the erection of a new government in Virginia, in 1776.
2dly. I will enquire how far those doctrines are controlled or affected by the principles of the revolution, and the provisions of our constitutional and legislative acts;, and
3dly. Whether any, and what, effects have been produced on this question, by the treaty of peace of 1783? The treaty of 1794, is entirely out of the question, as being subsequent to the commencement of the plaintiff’s action.
Under the first view, I will remark, that the terms “alien” and “alien born,” are used synonymously in the English law books ; for it being an established principle of the English law, that a subject born can never shake off his natural allegiance, 1 Bl. 369; 1 Rep. 25, a., it follows that none are there considered aliens, but those who are born so.
*The terms “alien” and “alien born,” and “subject” or “citizen,” are in their nature relative: and to what else can they have relation ; what else is their correlative, but the sovereignty or government where the discussion is?
The question then, in this case is, more particularly, whether or not the plaintiffs were, at the time of the descent cast, aliens, in respect of the commonwealth of Virginia?
This idea is entirely borne out by the English cases themselves. In Calvin’s case, 7 Rep. 1, the question was, “whether the plaintiff, who was born in Scotland after the descent of the English crown to James I. was an alien born, and, consequently, disabled to hold any real or personal action for lands within the realm of England?” Ibid. 2, a. But in the same case it was adjudged, that “whosoever is an alien born is so accounted by law in respect of the king:” Ibid. 25, a. The question, therefore, in Calvin’s case was, more particularly, whether he were an alien born, or not, in respect of the king of England?
Am I not therefore correct in saying, that the present question is, whether the plaintiffs were aliens or not, in respect of the commonwealth of Virginia?
An idea has sometimes been urged, that all those who are born subjects of the same common allegiance, can never be considered as aliens in relation to each other. See Wythe’s Rep. case of Farley v. Farley. I admit the truth of this position in every case where the plaintiff can shew himself to be no alien to the sovereign where he sues. I deny the truth of it, in every other case: in other words, the relation which existed between the two individuals is wholly an immaterial and foreign enquiry. I bottom this position upon Calvin’s case itself. I have already said, from that case, that an alien born is so accounted, “in respect of the king, ” and I will now add from the same case, “that this appeareth by the pleading so often before remembered, that he must be extra ligeantiam domini regis, without any mention made of the subject.” 7 Rep. 25, a. I might further add, from the said case, that “nec caelum nec solum, sed ligeantia *et obedientia,” make the “subject.” Ibid. 6. If allegiance gives the criterion, must we not unavoidably have reference to the government, and decide whether or not this allegiance exists? Under the position now controverted, the universal plea in cases of alienage would be wholly improper; (and well established pleadings are good evidence of the law;) the enquiry would be called off, from the question of allegiance or not, to the question of a common birth between the ancestor and heir, and this absurd consequence would follow that a recovery might be had, in any country, by persons born in any other country and not naturalized in it, the plaintiff making out his case, in this latter respect; the same person might also sustain one action, and fail in another, in the same country, and at the same time, according as the person under whom he claims might, or might not, have been born under a common allegiance with him !!
In Calvin’s case, (which -I principally resort to because it contains the whole doctrine upon this subject,) a definition is given of an alien; and it is, ‘ ‘that he is a subject that is born out of the allegiance of the king, and under the legiance of another.” 7 Rep. 16, a. This definition presents to us the only criterion whereby to discern who an alien born is; I say an alien born, because in this country a citizen born may become an alien by expatriation ; and, even in England, a subject born may become an alien, by the act of the government, though not by his own act.
Much indeed is said, in Calvin’s case, about the “time of the birth being the essence of a subject born,” &c. Ibid. 18, b., but it is evident that the time of the birth is no further material, than as explanatory of the principal question, viz. whether born within the allegiance of the king, or not ? This principal question, therefore, may be regarded as the sole one upon the subject. It is further said, in that case, that “natural legitimation respecteth actual obedience to the sovereign at the time of the birth,” 7 Rep. 27, a., but this is still . also referring to the same standard. ' It is here *to be remarked, that the object in Calvin’s case was, to discriminate between a Scotch antenatus and postnatus, in respect of a legitimation in England; the time of the birth was, therefore, a very material ingredient of the principal question, and may be regarded as. the turning point on which that question depended: it is no wonder, therefore, that, in a very long report, and one containing an abundance of extrajudicial matter, the same idea may be exhibited perhaps in different points of view, and be sometimes so indistinctly expressed, as to cause some embarrassment.
In the same case it is adjudged, “that the usual and right pleading of an alien born doth truly and lively express and describe what he is, and that this pleading is both exclusive and inclusive, viz. extra ligeantiam domini regis, et infra ligeantiam alterius regis.” 7 Rep. 16, b. I can find no principle of the common law which will exempt a person against whom the above plea will truly apply, from being considered as an alien born; I say of the common law, be *926 cause by the English statute of 29 Car. II. c. 6, an exception is made to this rule in a particular case, 1 Bl. 372, and perhaps there may be other statutory exceptions. I hold it, therefore, to be a universal proposition, that, by the principles of the English law, no man can sustain a real action, unless he either shews that this plea is not true with regard to him; or that, being true, he forms an exception to-it, by virtue of some statutory provision, or by having, subsequently, to his birth and before the accruing of the action, become legitimated in the country where the action is instituted; or, unless his title to the land is preserved to him by treaty or otherwise, and the right of suing is preserved by necessary consequence.
Some supposed exceptions have been confidently stated from the English books, but I flatter myself I shall be able to shew that they all fall strictly within my position. I will now proceed to examine them.
And, first, great stress has been placed, on behalf of the plaintiffs, on a resolution in Calvin’s case. 7 Rep. 27, a. *The resolution is as follows, viz. “And, as to the fourth, it is less than a dream of a shadow, or a shadow of a dream; for, as it hath been often said, natural legitimation respecteth actual obedience to the sovereign at the time of the birth; for as the antenati remain aliens as to the crown of England, because they were born when there were several kings of the several kingdoms, and the uniting of the kingdoms by descent subsequent cannot make him a subject to that crown to which he was an alien at the time of his birth; so albeit the kingdoms (which Almighty God divert, &c.) should by descent be divided and governed by several kings, yet it was resolved that all those who were born under one natural obedience while the realms were united under one sovereign, should remain natural born subjects and no aliens; for that naturalization due and vested by birthright cannot by any separation of the crowns be afterwards taken away, nor he that was by judgment of law a. natural subject at the time of his birth, become an alien by such matter ex post facto; and in-that case, upon such an accident, our post-natus may be ad fidem utriusque regis, as Bractou saith in the before remembered place, fol. 477 — sicut,” &c.
An objection had been made in that case by the defendant, “that if postnati were legitimated in England, what inconvenience and confusion would follow, if the royal issue should fail, whereby the kingdoms might again be divided.” 7 Rep. 26, a. The judges, taking up this supposed case, gave the answer to it which is above quoted. The objection having reference to'a supposed inconvenience in England, the answer to it must be considered under the same restriction. The judges are here of opinion that, in case of a dismemberment of the two kingdoms, and being -governed by several kings, the postnatus would still remain legitimated in England. This supposed case, however, differs from the case before us in the following particulars: 1st. The Scotch postnatus, in that case, was born tinder the allegiance of the king of England. 2dly. This allegiance being, by the English decisions, perpetual, continues, *(as the king of England continues,) notwithstanding the postnatus may have fallen under a different power. 3dly. And consequently, he may truly be said to be, in the language of the case, ad fidem, with respect to the king of England. And 4thly. The general plea before stated will not exclude this postnatus; for it cannot be said of him that he was born without the allegiance of the king of England. But, in the case before us, 1st. The plaintiffs were not born under the allegiance of this commonwealth, nor had contracted such allegiance at the time of the descent in question. 2dly. There was, consequently, no existing allegiance due from them to it, even on the English principles; nor could they be truly said to be ad fidem with respect to it. And 3dly. The general plea before stated would truly have applied to them, in both its members.
The above resolution, it is also contended, will go to sustain a claim, e converso, viz. by an English postnatus in Scotland, supposing the same common law to exist there, after the supposed dismemberment; and this view of the case, it is argued, has a strong analogy to the case before us. I have already said that this resolution should be considered with reference to England only: in relation to a discussion in Scotland, it was no case before the court; it was wholly extrajudicial: but upon principle, I cannot see a difference. The English postnatus was as much born under the allegiance of the king of Scotland, as the Scotchman was under that of the king of England. The kingdom of Scotland was (before the act of union) wholly independent of that of England, and James’s character of king of Scotland was not merged in that of king of England; after the supposed separation, a king of Scotland would still exist; there would be a continuation of the same government, and the allegiance due to the king of Scotland at the time of the birth, (before the separation,) would continue to that king after that event. It might truly be said of the English post-natus, suing in Scotland, that he was born under the allegiance of the king of Scotland, and was ad fidem with *respect to him: and the general plea before stated would not truly apply to him. The effect of this supposed dismemberment, therefore, would not be to destroy the tie of allegiance, by destroying the correlative of the subject, by establishing a different government on the ruins of that government to which the allegiance was due; but to transfer and continue to the persons of two kings that allegiance which before was due to one. I shall presently attempt to shew that, under the doctrines of those times, (as derived from a feudal origin,) it was no novelty for a subject to owe allegiance to two or more sovereigns. In this supposed case, therefore, quacunque via, there would be, according to the English decisions, an existing allegiance due to the king, in either country, which would capacitate the plaintiff to sustain the action.
The supposed case of a dismemberment, therefore, (entirely extrajudicial and hy *927 pothetical as it is,) only proceeds upon the idea of a separation of the crowns, of a descent to several kings: it does not put the case of a destruction of the kingly government. It goes upon the idea of a continuation of the same government, though under different kings, and a consequent continuation of the original allegiance : it is entirely different, therefore, from the case of the destruction of the tie of allegiance, by the erection of a new and different government upon the ruins of the old. Every position to be found in the English cases of this «'a, proceeds, at most, upon the former idea. The right of revolution, and erecting a new government, was not an admitted doctrine of the day; it was incompatible with the jure divino ideas which then prevailed. May we not, then, say with confidence, that the case now before us, had never entered the minds of the English judges? And that their decision, even where general, shall not be applied to a case, in which the grounds and reasons of their actual decision fail us, and which those judges most certainly never contemplated?
*Thesesame ideas must be borne in mind, while we examine a quotation from Bracton, 427, which is also much relied on, on the part of the plaintiffs. That quotation sa3’s, “there are some Erenchmen in Erance ad fidem utriusque regis, and always were so both before and since the loss of Normandy, and who plead here and there because ad fidem utriusque regis.” 7 Co. 27, b.
The Frenchmen here alluded to were Normans, born under the allegiance of the king of England, whilst he had possession of Normandy. It is here to be remarked, that the loss of Normandy, which Bracton speaks of, happened in the reign of king John, and in the year 120S, 2 Hume, 55, and that Bracton wrote in the reign of Henry III. 7 Co. 20, b. ; which reign began in the year 1216: so that this quotation evidently means those Normans born whilst Normandy was subject to England, very many of whom may be reasonably supposed to have been yet alive when Bracton wrote. Because they were born under the allegiance of the king of England they remained legitimated in England, by the English doctrines, even after the loss of Normandy, and were still considered as ad fidem with respect to the king of England: but they were also born under the allegiance of the king of Erance. Normandy was a fief holden under him: the king of England was, in respect of it, a vassal, and the king of France, his liege lord; and there are many instances to be found in the history of both nations, of the kings of England doing homage to the French kings, in respect to their possessions holden upon the continent. By the feudal law, “allegiance, properly speaking, is due to the lord paramount or sovereign.” 1 Bl. Com. 367. Under this idea, therefore, those Normans owed allegiance emphatically to the French king ; and in consequence of this allegiance it was, that they were, by the principles of the common law, permitted to sue in France. In illustration of this position we find it resolved in Calvin’s case, “that those who were born in Wales, before 12 Ed. I. whilst it was a distinct kingdom, were natural born subjects, (as to "^England,) because holden of England, or within the fee of the king of England. 7 Co. 22, b. These Welchmen, therefore, might as well as the Normans, sue in both countries ; and for the same reason, viz. because, and only because, they owed allegiance to both sovereigns.
Whilst I am upon this subject of allegiance, I will beg to refer to 1 Hale’s Pleas of the Crown, 58, et seq. who fully and elaborately proves, that there might be, and really were, in many instances, several allegiances due from a subject to several sovereigns. Thus, in p. 66, he tells us, that when Hen. II. made his eldest son king of England, in his lifetime, so that there was rex pater and rex filius, and when William, king of Scotland, had, at the same time, done homage to Henry the son, for his kingdom, saving the faith due to Henry the father, these several kings, though subordinate in respect of each other, were sovereign in respect of their subjects; and the subjects of Scotland owed an allegiance to their king, saving their faith to the kings of England, father and son, and an allegiance to Henry the son, saving their faith due to Henry the father. 1 Hale’s P. C. 66. It follows that these Normans, referred to by Bracton, owed at their birth an allegiance to both kings, (viz. of England and France,) and this allegiance continuing during their lives, upon the principles of the English law, they could always be said to be, in the language of the case, ad fidem utriusque regis. Blackstone, in confirmation of this position of owing several allegiances, admits that a natural born subject of one prince may, even by his own act, subject himself to another, though he may thereby bring himself into straits and difficulties. 1 Tucker’s Bl. part 2d, p. 370. Without enquiring into those difficulties, or differing the case of two several allegiances produced by the act of the party himself, this quotation is decisive to shew that, under the English doctrines, a natural born subject may owe allegiance to more sovereigns than one, even since the destruction of the feudal system.
*Am I not correct, therefore, in accounting for all these supposed exceptions, by shewing that, in every instance, there was an existing allegiance due from the party suing, to the respective sovereigns?
I have said, and I repeat, that no position by any of the English judges was predicated upon the idea of the erection of a new and different government. If there be any such, let it be produced. Are we not then to consider ours as a new case, not contemplated, nor provided for, bj the English decisions? The reign of James I. was not an sera when the judges were independent enough to have dared, or would have been permitted (see 11 Co. Rep. passim, to prove this), to argue upon the supposition of a destruction of the kingly government. That loyal and devout spirit which caused the judges in Calvin’s case, (27, a.) so much to deprecate a descent of the kingdom to several kings, t’-'at slavish devotion of *928 the judges to the will of king James, which, in relation even to this very case of Calvin, Hume remarks with censure, in more passages than one of his history, (see Hume’s Hist. vol. 5, p. 554, and vol. 6, p. 169. See also in 4 Cranch, 210, other authorities cited to shake the decision in Calvin’s case,) while it goes far to destroy the authority of the decision, would not have permitted them, for a moment, to contemplate the idea of the erection of a popular government upon the ruins of a throne, deemed, in the mania of the times, to have been held by divine authority.
In the total absence, therefore, of a case of this kind, either actual or contemplated, in the English authorities, we must reason only from analogy.
It is held in Cowp. Rep. p-. 208, “1st. • That a country conquered by the British arms becomes a dominion of the king in right of his crown,” &c. and, 2dly. “That the conquered inhabitants once received under the king’s protection become subjects, and are universally to be considered in that light, and not as enemies or-aliens;’ ’ and in 1 Bl. Com. 103, the reason of this privilege is given; it is, “that in *order to put an end to hostilities, a compact is either expressly or tacitly made between the conqueror and the conquered, that, if they will acknowledge the victor for their master, he will treat them in future as subjects, and not as enemies.” Now nothing can be clearer than that, if the whole territory of the belligerent nation is not conquered, the inhabitants of the unconquered part continue to be, in respect of the sovereign of the part conquered, enemies and aliens; enemies during the war, and aliens after the peace. They do not become subjects of the conquering power and are not to be considered in that light; because they have not submitted to the conqueror, nor by any compact entitled themselves to the privileges of subjects; and yet they were once inheritable in the territory conquered, and can say as much as the present plaintiffs can say in respect of the territory of Virginia, viz. that, at the time of their birth, they were legitimated here. The people themselves who are conquered are legitimated by virtue of the implied compact only, and cannot claim such legitimation by the paramount title of having been, at the time of their birth, inheritable in that territory under another sovereign. If, then, the territory of Virginia, had been conquered from Great Britain in the ordinary way, bj an existing sovereign, there is no doubt but that, upon the foregoing principles of the common law, the residuary subjects of the British empire, not residing here, nor contracting an allegiance to the conquering power, would have remained aliens, as to the sovereignty established here by such conquest. I confess I cannot see a difference between that case and ours: I see no difference in this respect between a change of the sovereignty of Virginia effected by an existing sovereign, and by a sovereign merely coeval with the change: and I should be sorry to be obliged to admit, that a people forming a government by compact, have not as ample power, both to confer rights upon the members of such compact, and to exclude the rest of the world from a participation of them, as a conqueror dictating at the 200 point of the sword; nor can *1 agree that the natural (though silent) operation of a compact government is less efficacious, in either respect, than that which, as to these particulars, is produced by a conquest.
I conclude, therefore, that, according to the acknowledged doctrines of the English common law, all the before mentioned supposed exceptions are referrible to a principle which- does not exist in our case; I mean that of a continuing and existing allegiance; that the case before us, of the erection of a different government, and the destruction of the ancient tie of allegiance, had never entered the minds of the English judges, when they were so copiously, and so extrajudicially, (in Calvin’s case,) dealing out their doctrines on this subject; that if it had, they could not have sustained the pretensions now set up by the plaintiffs in the present instance, without revolting against, and overthrowing, their own admitted principles : and that as far as we can judge by analogy, the principles of the English law authorizes us to say that, in the actual case before us, an English court, itself, would fender judgment in favour of the defendant.
This view of the subject supersedeas the necessity of saying much on the second branch of my enquiry; namely, how far the English doctrines on this subject are controlled by the principles of the revolution, and the provisions of our constitutional and legislative acts. If the actual principles of the English law will suffice for the defendant in the case before us, that defendant holds a much stronger ground in this country, and in this court, which must reject such of those principles as are heterogeneous to our republican institutions. All the English decisions upon this subject are bottomed upon three main principles, neither of which can be admitted in the case before us. They are, 1st. That allegiance is perpetual, and cannot be renounced by the subject; 2dly; A supposition of the continuation of the same sovereignty to which this perpetual allegiance was originally due; and, 3dly. The character of that allegiance, by the English law, is, that it is due to the person of the sovereign, *and not to his political character. 1 Tuck. Bl. part 2d, p. 371. As to the last position, we have, happily, no king, to whose sacred person this allegiance may be said to be due. It is the government only, which affords protection to the citizen, and to this government only, which is perpetually changing, as to the persons who administer it, though itself is permanent, the allegiance of the citizen is due. As to the second position, I need not repeat that the American people have erected a different as well as a new government. The first position requires more consideration.
The decisions by the English courts at remote and arbitrary periods, and the municipal treatises of that country bottomed thereon, have denied the existence of a great natural right; I mean the right of expatriation. It is the character of the *929 common law that it draws from various sources, is compounded of parts of various laws and codes, and refers to various arts and sciences. It is also a maxim of that law that “cuilibet in sua arte credendum est;” and Lord Coke tells us, somewhere, that it is better “petere fon tes quam sec-tacri rivulos.” Shall we not, under the sound sense of these maxims, correct the mistakes of a municipal code, touching a question of general law, by referring to the fountain from which itself has drawn? Shall we decide a question of natural right, and of general law, by referring to the most approved writers, and to the sense of the world, on that subject, or be governed by the particular municipal codes of a particular country? I believe, sir, that this position of the English judges has always stood condemned by the most enlightened writers upon natural law'. I mean not (as being unnecessary in the present case) to investigate this point at this time; but I beg leave to refer to the new edition of Blackstone, (vol. 1, part 2, note K. p. 90,) where the editor has elaborately discussed the subject, and his conclusions seem fully to sustain my position. See also Vattel, B. I. § 220, 'Í 223. I rather choose to refer to the sublime principles contained in the declaration of independence, and in the Virginia bill of rights, consecrating the *right of expatriation; to the memorable assertion of that right by the American people, who, sword in hand, expatriated themselves from the government which tryannized over them; to the limited and qualified adoption of the common law, as a part of our code; and to that dignified act of the Virginia legislature which prescribed the mode of effecting an expatriation, but did not presume to bestow the right. See acts of October 1783, ch. 16.
While these great authorities destroy some of the main pillars on which the English doctrines on this subject are founded, the Virginia legislature by several acts have declared who shall be deemed citizens, and who aliens. Under those acts, the plaintiffs, at the time of bringing’ the action in question, must have fallen into the latter class. It has been supposed by some that, inasmuch as the act of May 1779, ch. 55, after declaring who shall be deemed citizens, declares that all others shall be deemed aliens, and as in a subsequent act (October 1783, ch. 16,) on the same subject, this latter declaration is omitted, that the last law is to receive a more enlarged construction in relation to aliens than the former. 2 Tuck. Bl. app. p. 62. These answers occur to me, however, to this position. 1st. As every man, according to the English doctrines, is either “an alien born or a subject born,” 7 Co. 601; and, according to those doctrines, as here received, is either an alien or a citizen, it was perhaps a work of superrogation after declaring who, and who only, should be deemed citizens, to declare, also, who should be deemed aliens; and, 2dly. That position proves too much, for it would equally legitimate the subjects of all other countries in the world, as of England, whereas the same authority seems to think that the omission was produced by the intermediate conclusion of the treaty of peace between America and England. To say nothing of the absurdity of the legislature’s doing away, in the gross, the disabilities of alienage, when, at the same time, it was granting in detail, the rights of citizenship, it is contrary to all fair deduction to infer a conclusion, which is very general and extensive, from a cause which is limited and particular.
'*Such is the construction which I deem myself obliged to adopt in the present instance. If the adherence of the British subjects to their own government, on the erection of our government in 1776, has thrown them into the class of aliens by election, a definition I think properly applied to them in the new edition of Blackstone, (see vol. 1, part 2, app. p. 102,) they stand on as good a footing as our own expatriated citizens. Subjects of foreign nations have no reason to complain at receiving the same measure as is dealt out to our own citizens, unless they have ulterior rights secured by treaty. Such a treaty would not be natural nor reasonable: but if such a one exists, it must probably have' its effect. Whether there be any such treaty rights in the present instance, we shall presently enquire. These British subjects have, however, less pretensions to sue than our own expatriated citizens; for the latter can say (which the former cannot) that they were once under the allegiance of the commonwealth of Virginia; nay, in some instances, that they were born under the allegiance of this commonwealth. Why then shall we not consider these British subjects as expatriated, in respect of the commonwealth of Virginia? Expatriated, by having refused to yield to us their allegiance, and to unite their destiny with ours.
I have thus chosen to consider the pretensions of the antenati, or in other words the common law doctrines of legitimation, somewhat at large; because those doctrines have been often pressed upon this court, particularly in the case of Fairfax v. The Commonw'ealth, and have received countenance from the opinion just delivered.* In all the elaborate discussions which have taken place in this court upon this subject, there has been heretofore no difference of opinion upon this point, as far as I have understood the judges: and our late venerable president† (who did not sit in those causes) has informed me, since they were determined, that he entirely agreed in opinion with the court upon this subject. But for the foregoing considerations, I might perhaps *have saved myself this trouble, for it appears that both the treaty of peace and the treaty of 1794 have repudiated the pretensions of the antenati. The latter treaty does not immediately apply to this case, being posterior to the judgment in question, and would not now be mentioned, but as corroborating and explaining the former. That treaty abandons those pretensions by setting up a new criterion, viz. the actual holding of the property at the epoch of its date. In set *930 ting up this epoch, and establishing a new criterion in relation to British subjects, that treaty goes beyond the common law idea of antenati, which calls merely for the period of our separation from Britain; and by superadding the other requisite, (an actual holding at its date,) it also abridges the pretensions of such antenati, for all the residue of their lives, subsequent to the signature thereof. ' In thus enlarging and abridging the common law pretensions of the antenati, am I not correct in saying that the treaty of 1794 has set up an entirely new rule, and has abandoned those pretensions altogether? So, with respect to the treaty of peace, the case is precisely the same, if that treaty be considered as relating at all to the laws of alienage of the several states, and the epoch of its signature be resorted to as protecting from the operation of those laws, rights accruing before that time: and this, perhaps, is the most that can be contended for. Whether this construction thereof be correct will presently be considered. At present I will remark that it is entirely incompatible with the before mentioned common law rights of antenati which are commensurate with the duration of their lives. Am I not, therefore, correct in saying that both these treaties have abandoned the pretensions of the antenati, and taken a new ground (whatever it may be) in favour of British subjects? If that ground of claim exists, therefore, in the case before us, it is not upon the foundation of either of the said treaties.
We come next to consider, somewhat more at large, the application and effect of the tréaty of peace, in arresting the operation of the laws of alienage of the several states. , ■
*Under this head, I will consider, for the sake of greater perspicuity, the rights of British subjects in a fourfold point of view. 1st. In relation to land actually holden by such subjects in this country, at the epoch of our separation, or declaration of independence: a right of this sort not existing in the present case, this topic will be but slightly and incidentally touched.
2dly. In relation to lands purchased by such subjects in this country, since the epoch last mentioned, and which, if -they be aliens, enure to the commonwealth by way of “forfeiture.”
3dly. In relation to such lands as since that epoch have descended to such subjects, and which, if they be alieris, enure by way of “escheat.” Every' thing said on those two points will apply, a fortiori, to the case now before us, being that of a descent cast, since the date of the treaty; and
4thly. In relation to the capacity of such subjects to sue for lands so holden, purchased, or descending, as the case may be.
In laying down these points, I must be permitted to cling, with equal pleasure and pertinacity, to the epoch of our declaration of independence, rather than that of the treaty of peace, as erecting us into an independent nation; as affording that precise point of time to which alone the treaty applies, (if it applies at all,) in arresting the laws of alienage of the several states: I must cling to this epoch, because the United States, on that da3, for the many weighty reasons then declared, dissolved forever the connexion antecedently existing between us and Great Britain ; because, in the emphatical language of the Virginia constitution, the many acts of misrule theretofore committed, by the British’king, had dissolved his government over us: because the whole fabric of the old government was, in truth, annihilated and destroyed by that king’s withdrawing his protection from us, and our abjuring allegiance to him; and because the’ British nation itself has conceded this point, by admitting in the treaty of peace, (art. l,)'that it “treats with the United *States as free, sovereign and independent states,” and not as revolted subjects; thereby clearly relating, in that treaty, to the asra of the declaration of independence. Awaj then with that absurd and slavish doctrine which would derive every thing from the recognition and bounty of the British king; would postpone, for near eight years, our title to rank among the independent nations of the earth; and degrade, for the same , period, all our laws ánd resolutions, to the level of usurped and unauthorized acts. We date our independence from this asra, on grounds paramount to any thing in the power of that king to grant or todo: we treated with him for peace, but not for independence: we asked him to put an end to the war, but not to sanction a government already established upon the only just basis, the consent of the governed.
I would construe the general words of the treaty to relate to this epoch, not only for the above mentioned reasons, but because, in truth, that great ev.ent, in connexion with the laws of alienage of the several states, drew a prominent line of distinction, in relation to lands acquired in this country by British subjects. While it exhibits all lands previously acquired, and then holden in ■‘■his country, as being lawfully acquired, under the faith of existing laws, and entitled to the attention of the contracting parties, it throws into the class of nullities, and illegal and unauthorized acts., all posterior acquisitions of lands by British subjects. Powerful reasons existed, therefore, on this ground, for embracing the epoch of our independence, rather than that of the treaty, in applying that instrument to the ar-restation of the laws of alienage of the several states, admitting, for the present, that it all relates to such laws. On the part of the United States, the great considerations just stated, (to say nothing of others which will be presently noticed,) must have had great weight ; and the British king might, on his part, while he admitted himself bound to treat for a guaranty of lands fairly acquired by his subjects in this country before that epoch, have justly considered himself absolved from any ^obligation to create, or at least enlarge titles in favour of his subjects; to support and extend that nullity of an interest acquired here, by them, after the commune vinculum was broken.
*931 In contemplating the effect of the treaty of peace upon the case before us, I will first consider, as being a stronger case for the plaintiffs, than that of a right accruing by ‘escheat, ” the right of the commonwealth, by way of “forfeiture,” to lands purchased by British subjects, since the ¡Era of our independence.
The words of the treaty, which are supposed to have an effect on the present question, are, that “there shall be no future confiscations made.” (Art. 6.) What is the import and extent of the term “confiscations” here used?
The right of the commonwealth to lands purchased by an aLien, is an ordinary right derived from the common law. It exists at all times. It is independent of, and does not arise out of a state of war. In the present case, it resulted to the commonwealth from the establishment of a new government here, and the nonaccession of the plaintiffs to that government, prior to the commencement of their claim. Although in fact, the plaintiffs were enemies to their country, from the commencement of our hostilities with Britain, they were not, legally speaking, aliens, until the erection of our new government. Anterior to that event, the right now in question could not have resulted to the commonwealth. So, on the other hand, if the erection of our new government had preceded or been unaccompanied by a state of war, the right in question would have resulted, as well prior as subsequent, to the existence of hostilities. Therefore it is that I say this right does not arise out of a state of war: it results from a mere municipal regulation. It accrues, not because the person purchasing is an enemy, but because he is an alien. It is not a right pointed against the subjects of a particular power with whom we may chance to be at war, but against the subjects of all foreign nations whatsoever. This right is, by the common lawyers, technically denominated *a “forfeiture.” “Forfeitures of lands and goods for offences,” (and this right is founded on the offence of an alien in presuming to purchase lands contrary to law, 1 Bl. Com. 372, 2 Bl. Com. 274,) says sir William Blackstone, “are called by the civilians, .bona confiscata, because they belonged to the fiscus or imperial treasury, or, as our common lawyers term them, bona foris facta. ” 1 Bl. 299. Indeed, lord Coke seems, in one passage, to consider “confiscation” and “forfeiture,” as synonymous terms, 3 Inst. 227; and the author of the commentaries appears also, in a few passages of his work, to have used the term “confiscation,” as descriptive of a forfeiture into the treasury; but keeping in view the distinction, which this elegant and accurate writer has taken, between the terms as above stated; (the one being a civil law, and the other a common law term;) and finding that he has expressly treated of the right now in question in a chapter headed “title by forfeiture,” 2 Bl. Com. 267, I must conclude that the technical and appropriate term, descriptive of this right, is forfeiture, and not confiscation. At least, it must be granted, and that is sufficient for my purpose, that the former is a much more usual and proper term than the latter, to designate the right in question. I urge it as a very respectable authority in favour of this opinion, that the constitution of Virginia, in transferring this, among other rights, from the king to the commonwealth, uses the terms “escheats, penalties and forfeitures,” art. 20, without making any mention of “confiscations. ”
I admit that, where the term “confiscation” shall occur in a treatise or instrument relating only to the common law, it shall there, from obvious necessity, be taken as synonymous with “forfeiture;” and, indeed, in any other treatise or instrument, where the term may not otherwise be satisfied, or where it appears evident it was intended to have that extensive signification. But on the other hand, in instruments which concern the civil law, or the jus belli, it is reasonable to tie up the meaning of the term confiscation *to forfeitures of that kind; or rather to understand the word in its proper and legitimate signification; it would be unnatural and unnecessary, in that case, to extend it so as to comprehend forfeitures arising only from the common law.
Besides this ordinary and municipal right of forfeiture, there is, as I have before said, an extraordinary one accruing to belligerent nations, of confiscating the property of their enemies. This right does not await and attend on the contingent event of a purchase by, or descent to, an alien; it effects property then actually holden by the enemy; it is not carried into effect by the ordinary course of the municipal laws; the property is seized and confiscated by an extraordinary act of the government of the belligerent nation. It is seized, not because it is the property of an alien, but of an enemy. This right is technically and properly denominated a right of confiscation; I know of no other term which will properly designate it.
Here, then, are two senses, in which the term “confiscation” may be used. The one, (to omit its civil law signification,) a restricted sense, going merely to a seizure by a belligerent nation in right of war ; the other an extensive sense, meaning not only what is just mentioned, but, further, a mode of acquiring property by the commonwealth under a permanent municipal regulation ; a sense extensive enough, not only to repeal the general laws, of alienage of this commonwealth, in cases like the present, but also, (if not restrained by other considerations,) to remit, perhaps, all forfeitures whatsoever, incurred, in this country, by British subjects or refugees, by crimes or otherwise! Bet us enquire in which sense .this term was intended to be used in the article in question.
This article is contained in a treaty of peace. “A treaty of peace,” says Vattel, “naturally and of itself relates only to the war which it puts an end to, and therefore it is only in such relation that it is to be understood.” Vattel, p. 34. Such a treaty, therefore, does not naturally relate to a mere municipal forfeiture or regulation, no way dependent *on, or produced by, a war. This construction *932 is much strengthened, in the present case, by the consideration that the American government, which formed the treaty in question, was much limited in its powers by the articles of confederation. That compact had emphatically reserved to the several states “their sovereignty, freedom and independence, and every power, jurisdiction and right not thereby expressly delegated to the United States in congress assembled.” (Art. 2.) Such stipulations in treaties, therefore, and such only as were warranted by the express grant of power to the United States, were binding on the several states when opposed by their laws. This construction of that compact is admitted by the circular letter of congress of April 13th, 1787, (see it quoted in Jefferson’s letter to Hammond, p. 48, $ 38,) requesting the several states to repeal all acts contrary to the treaty of peace; it is asserted by the legislature of Virginia in their two acts of 27th June, 1784, and 12th December, 1787, which have only made such repeal in relation to British debts, on the conditions therein contained; it is expressly maintained and acted upon by our commissioners who negotiated that treaty, (see documents 7, 8, 9, 10 and 11, p. 70, attached to Jefferson’s letter aforesaid,) and is admitted by the British commissioners, who acceded to a recommendation only, in relation to the restitution of the confiscated estates. (See art. 5.) In short, the limited government of the confederation was principally a government of requisition. In some cases a recommendation, or request to the several states, to repeal their conflicting laws, is expressly contained in the treaties themselves. In other cases, such request is inferrable from the insertion in treaties of. such stipulations as congress deemed necessary for the public good, but which yet required the sanction of the state legislatures. The Sth article of the treaty in question, just noticed, furnishes an instance of the former kind; and instances of the latter are to be seen in several of our foreign treaties which expressly waive the disabilities of alienage, in favour of the subjects of certain friendly, powers.
*The documents just referred to entirely shew that the American commissioners who negotiated the treaty in question strenously disclaimed a power in congress to “interfere in matters appertaining to the internal polity of the several states;” afad even declared that their power did not extend to stipulate for a restitution of confiscated estates, because those confiscations had been made under the authority of the several states; and hence a mere recommendation was proposed by them, and acceded to by the British' commissioners. Congress did possess the power, ■and did exercise it, to prohibit confiscations (i. e. jure belli confiscations) in future: but they disclaimed the power to restore such property as confiscations, even of this class, had brought into the treasuries of the several states. This last case is much stronger than the one before us. As congress had the power of peace and war, it might well have been argued that a right arising only out of the war appertained to them, rather than to the several states, and that their power would reach even the case of a restitution; j^et the several states having actually exercised this right, by seizures and sales, congress disclaimed the power to interfere otherwise than by recommendation. But the right of escheat and forfeiture now in question could on no construction appertain to congress; it strictly “appertained to the internal polity of the several states,” and was, emphatically, beyond the power of congress. Congress had a right, by treaty, to convert enemies into friends, and to release the disabilities attached to the former character; but they had no power to invade the ordinary rights of the several states, and to invest with the privileges of citizens of Virginia, those whom the policy of her laws had thrown into the class of aliens. If congress, by the confederation, could not draw a shilling of money from the several states, but by requisition, it would seem to follow, that the assent of the states was equally necessary to pass their right to property, which needed only the formality of an inquisition and sale to bring it into their treasuries. If congress, by the *8th article of the confederation, were bound to defray “all charges of war and other expenses to be incurred for the common defence and general welfare, out of a common treasury, to be supplied equally,” (by a given rule,) “by all the states',” shall we make a construction, in the case before us, which would throw the price of peace, in the present instance, on some of the states, in ease of others? upon the states keeping up the laws of alienage, as incidental sources' of revenue, in favour of such states wherein no such laws existed?
If by the 9th article of the compact aforesaid, the powers expressly specified, and delegated to congress, are only those of peace and war, and other powers of an external nature, relating chiefly to our intercourse with foreign nations, shall we adopt a construction in the present instance, which will depart from the general character of those powers, and invade a right of the several states, entirely of an internal and municipal nature?
But, independently of these considerations, I have supposed the word “forfeiture” to be a more proper term than “confiscation,” to extinguish the right now claimed. The English law and ours are precisely the same on this subject: nay, I have even taken my ideas upon the subject entirely from the English authorities. As the English commissioners are not to be supposed ignorant of the real powers of our government, neither can they plead ignorance in relation to their own laws or technical terms, in forming the treaty. If the right now in question had been intended to be extinguished, would not the most appropriate terms have been used, especially in an instrument which, of itself, does not naturally reach that right? As these commissioners must have known, and were even warned, (as the aforesaid documents shew us,) of the incompetency of congress to affect the municipal policy of the several states, would they not at least have used the strongest and most unequivocal terms *933 to effect that purpose, had it been contemplated or intended? Is it not an established principle of the law of ^nations, “that the state in which things are found at the moment of the treaty shall be considered as lawful; and, if it is meant to make any change in it, the treaty must expressly mention it; and that, consequently, alt things about which the treaty is silent, remain as they were found at its conclusion?” Vattel, B. 4, | 21; and does not the sound sense of this rule equally extend to cases where terms are used, which, to say the least, are equivocal, and may be otherwise amply satisfied? If in several of our treaties of amity and commerce with friendly European powers, the several states are called on, by the most particular and express stipulations, to waive their laws of alienage, in favour of the subjects of such powers, does it readily follow that in a treaty of peace with an enemy nation, an expression entirely congenial with the character of such treaty, and which can be otherwise abundantly satisfied, shall have this most important effect? Nay, even, if in the treaty of amity and commerce, formed by us with the same power, (Great Britain,) in 1794, some partial privileges on this subject could only be obtained for British subjects, and those conferred by the most explicit and unequivocal terms; if even these privileges, notwithstanding the lapse of eleven years since the date of the treaty of peace, created a general ferment in our country, arising from the recollection of ancient injuries; shall we construe the general words of the treaty before us, to have an equal or more extensive effect?
The term “confiscation,” then, when occurring in a treaty of peace, and especially in such a treaty formed by the limited government of the confederation, naturally means, ex vi termini, a confiscation jure belli, and nothing further. If I am right in this idea, it was unnecessary, in the 6th article of the treaty before stated, to annex other and tautologous words, to make this more plain, to confine its signification to forfeitures on account of the part taken in the war. Such was already its meaning, and additional words would have been entirely superfluous: and this is an answer to the objection arising from the annexation of such words to the *'prosecutions mentioned in the same article, of which more hereafter. I hold it also, to be of great weight, in favour of my construction in this particular, that the confiscations here prohibited have this character more clearly designated, by being interdicted in the same article, and sentence of that article, with prosecutions on account of the part taken in the war.
If I am right in the above idea, as to the natural and general signification of the term “confiscation,” when occurring in treaties of peace; that construction gains additional weight in relation to the treaty before us, by the further consideration that there were, in fact, many such confiscations made by the several state governments, during the revolutionary war. Perhaps I shall be warranted in saying that there were in fact such confiscations made by every state in the Union. See Hammond’s letter to Jefferson. Some of those confiscations were made by the very bills of rights or constitutions of the several states, but in general by legislative acts. Of the former class it may be seen that the 25th article of the bill of rights of North Carolina, seems to confiscate the proprietary rights to lands within the limits of that state ; the legislative acts were of various descriptions, as acts of attainder, of seizure and confiscation, &c., as may be seen at large in the documents attached to the letter just referred to. The Virginia act, upon this subject, after reciting that, by the declaration of independence, by the United States, the residuary subjects of the British empire, became enemies and aliens to the said state, enacts, that all the property lying within the commonwealth, belonging at that time to any British subject, &c. shall be deemed to be vested in the commonwealth; and a subsequent clause describes who shall be deemed British subjects within the meaning of the act. (October 1779, c. 14.) The passage of this act, ipso facto, confiscated the property therein contemplated ; and the only enquiry necessary to be made, or which in fact was made, (see inquisitions in the office of the general court,) under this act, ,as it respected the proprietor *of the land, was whether he were a British subject, or not, within the meaning of the act; there was no enquiry whether he was, by law, an alien.
This act was emphatically an extraordinary act of confiscation. It was in addition to, and not in exclusion of, the ordinary municipal law of escheat and forfeiture, on account of alienage. It only reached British property then actually holden; whereas the general law extended also to lands afterwards acquired by British aliens. This act confiscated the property of all British subjects; whereas, the general law only reached the real property of those who were aliens. It may not universally hold, that all British subjects were then aliens, and if the ideas of the plaintiff’s counsel were correct, the general law would not reach lands acquired hereby British antenati. These are prominent marks of distinction between the two laws; and this partial exercise of the extraordinary right of confiscation certainly did not supersede, or interfere with the general law, further than that act has expressly gone.
Some stress has been laid upon the act of October 1784, c. 53, respecting future confiscations. It is not proper for me to avail myself of a knowledge acquired in another place, that it was decidedly the intention of the then legislature to avoid construing the treaty. There were various opinions then existing as to its true construction, and the prejudices and animosities of the day were not inconsiderable. Hence the act eventuated in using the very words of the treaty itself; and that merely by way of yielding the sanction of this state to that instrument as it really existed. That act meant not to take any new or extended ground whatsover; and the proviso contained therein, inhibiting suits commenced posterior to the ratification of the treaty, *934 can only extend to suits grounded on such confiscations as were intended by the treats' and the act to be prohibited.
Before X come to a particular examination of the 6th article of the treaty, I will take a short view of the Sth. The character of the confiscations interdicted by the 6th article *will be elucidated by considering what kind of confiscations are contemplated in the Sth.
That article is in the following words:
1 ‘It is agreed that congress shall earnestly recommend it to the legislatures of the several states, to provide for the restitution of all estates, rights and properties which have been confiscated, belonging- to real British subjects, and also of the estates, rights and properties of persons resident in districts in possession of his majesty’s arms, and who have not borne arms against the said United States. And- that persons of any other description shall have free liberty to go to any part or parts of the thirteen United States, and therein to remain twelve months unmolested, in their endeavours to obtain the restitution of such of their estates, rights and properties, as may have been confiscated; and that congress shall also earnestly recommend to the several states a reconsideration and revision of all acts or laws regarding the premises so as to render the said laws or acts perfectly consistent not only with justice and equity, but with that spirit of conciliation which on the return of the blessings of peace, should universally prevail. And that congress shall also earnestly recommend to the several states, that the estates, rights and properties of such last mentioned persons shall - be restored to them, they refunding to any persons who may now be in possession of the bona fide price, (where any has been given,) which such persons may have paid on purchasing any of the said lands, rights or properties since the confiscation. And it is agreed that all persons who have any interest in confiscated lands, either by debts, marriage settlements, or otherwise, shall meet with no lawful impediment in the prosecution of their just rights.”
This article, upon a general view, relates onl3 to legislative acts of confiscation. It relates materially to the refugees, who, not being aliens, were airead}’ safe from the operation of the laws of alienage. It relates, also, it is true, to confiscations made of the property of real British subjects; but as it purports to provide for the ‘‘restitution of their estates, *rights and properties,” it cannot mean to extend to cases of purchases of lands by, or descents to, British aliens, posterior to our separation, nor to the common law proceedings adapted to such cases. In such cases, such aliens have not any estate, right or property in such lands, nor would they be restored thereto: if the treaty arrests such proceedings, it would not restore, but create and enlarge the estates of such aliens. Cases of this kind, and the ordinary proceedings of forfeiture founded thereon, were not, therefore, contemplated in this article. With respect to the superior claims of those who held land here at the *ra of our separation, I am not prepared, at present, to | say, whether the ordinary proceedings of escheat and forfeiture, could ever have divested them. Meaning to touch this topic slightly hereafter, I will only at present say that, if they could not, then, (as no necessity exists for it,) such proceedings shall not be construed to be comprehended in the confiscations mentioned in this article ; nor will the case be otherwise, admitting the law to be different, if (as I believe) no forfeitures of this class had in fact taken place in America prior to the date of the treaty; and such, therefore, could not have been the ground of any stipulation in it. During the existence of the war, the ordinary law of escheat and forfeiture had not been put in force against British subjects. It had yielded to the more powerful and direct course of legislative confiscation, which was deemed preferable, and was universally pursued. I am authorized to a'ssume this as an indubitable fact, because Mr. Hammond, (see his letter, p. 10, of the correspondence,) after ransacking all our laws and judicial decisions, from the beginning of the war to the time of his writing, has only stated one case (that of Harrison’s representatives) in which a decision on this point has been given. That case will be set out presently from the documents attached to the before mentioned correspondence; from which it will appear that it was neither rendered by the supreme court of the state (Maryland) in which it was decided, nor rendered until the year 1790. When the devise *in question, in that case, accrued is not stated. Am I not, therefore, correct in saying that no instances of the enforcement of the ordinary laws of alienage had taken place, in relation to British subjects, prior to the treaty of peace, and that, therefore, in providing for the restitution contemplated in the Sth article, it was wholly unnecessary to meet such cases? Courts, in making their constructions upon laws or treaties, may take notice of general and nororious facts, affecting such construction. The English courts (for example) have in many instances taken notice of and acted upon the general delusion created by the South Sea bubble in that country, in the beginning of the last century. See 1 P. Wms. 746. So, as in the present instance, the long and laborious researches of the British minister before noticed, have produced no instance of the enforcement of the laws of alienage against British subjects prior to the conclusion of the treaty, wherefore shall we give to that instrument a construction confronted by so many objections, and only (at most) necessary, if such decisions had actually existed?
It is also not unworthy of observation, that congress are called upon by this article, ‘‘to recommend to the several states a consideration and revision of all acts or laws regarding the premises,” thereby meaning such special and particular statutes as may have been passed bj’ the state legislatures on the subject: they are not enjoined to recommend an exemption in favour of British subjects, from such disabilities; as accrued, not by virtue of particular législative acts, but by the conjoined effect of the revolution, and the common *935 law, relating- to alienage, antecedently existing in America.
If, then, the 5th article of the treaty relates to legislative confiscations only, let us next inquire whether the 6th article is to be understood in a more extensive point of view; bearing in mind the general principle, that the same word, occurring in different parts of an instrument, shall generally be understood in the same sense.
*'That article is as follows:
“That there shall be no future confiscations made, nor anj prosecutions commenced, against any person or persons, for or by reason of the part which he or she may have taken in the present war, and that no person shall on that account suffer any future loss or damage, either in his person, liberty or property; and that those who may be in confinement on such charges at the time of the ratification of the treaty in America, shall be immediately set at liberty', and the prosecutions so commenced be discontinued.”
This article, upon the whole context of it taken together, can only relate to those who, being American citizens, afterwards became refugees, and joined the enemy; it cannot relate (in a collective point of view) to real British subjects. Keeping out of view, for the present, that member of the article, which prohibits future confiscations, and which requires a more particular examination, would it not be absurd to stipulate that after peace had taken place between the two nations, we should commence no prosecutions against real British subjects for the part they had taken in the war? That part was not, in them, a culpable part; it was one which their duty and allegiance as subjects required them to take. Not residing in this country, nor being oppressed as the Americans were, it was not their business to join in our revolt, nor to take a part in our battles. If there had been no such article in the treaty, and America had thereafter commenced such prosecutions against such British subjects, Great Britain would have justly considered them as acts of hostility against her. This provision, then, as relative to real British subjects, is wholly superfluous, and unnecessary ; it shall not, therefore, be construed to have relation to them. But, with respect to the American refugees, this stipulation was strictly' necessary and proper. They had become citizens of the American states, and without expatriating themselves, had joined the standard of the enemy. After the peace, the several states might justly have called these their offending citiZens to a severe account *for their conduct; but the humanity and hon-our of the British nation was deeply interested to protect them; to protect these American traitors from the vengeance of their own governments. The latter part of this article therefore applies exclusively to them; however it may be with the former. The interdiction of prosecutions for the part they had taken in the war, and of loss or damage accruing therefrom, as it related only to them, so it alone effectually secured them from such common law forfeitures as were incident to attainders or prosecutions for treason. As to confiscations, in relation to these persons as they were not legally aliens, in the several states, they were already sufficiently safe from the effects of the laws of alienage. The inhibition then of legislative confiscations, conjoined with the interdiction of prosecutions on account of the part taken in the war, would entirely secure and protect the refugees. Wherefore then give -the treaty a construction which entrenches upon the municipal rights of the states, when every necessary end, in respect of the refugees, can be attained, by understanding the term “confiscations” in its usual and ordinary sense?
With respect to real British subjects, it is equally absurd to apply to them the interdiction of the prosecutions, and tautologous to extend to them the confiscations prohibited in this article, even meaning thereby legislative confiscations. At the most, the article can be so understood, as to them, only through abundant caution. We will next inquire whether any necessity exists, in relation to them, (as it clearly does not in relation to the refugees,) to strain the term in question, beyond its usual and proper signification, and so far as to arrest the operation of the general laws of alienage?
The policy of the British government may justly be considered as different in relation to lands held here by their subjects at the time of our separation, and those afterwards acquired. With respect to the former lands, they are safe in the hands of such holders, bj' the principles of the common law concerning escheat and forfeiture, literally understood. *The principles of that law, as understood in England, not permitting a renunciation of the original allegiance, nor contemplating the event of the erection of a new and different government, the case now before us was never presented in England, nor provided for by their law. The only inquiry in that country had relation to the capacity of the person purchasing or claiming by descent, at the time of such purchase or descent respectively. The British holders of land in this country, at the aera of our separation, having been therefore capable of obtaining and holding lands here at their respective times of acquisition, committed no offence against our laws, and are safe from the penalties of the laws of escheat and forfeiture, by the literal terms of the common law. It is a great question, but one respecting which X have formed no final and decided opinion, whether the common law should be moulded, in this country, on the great principle that citizens may become aliens, and of course incapable of acquiring lands, so as to reach this case also, of lauds lawfully acquired, and only rendered unlawful to be holden (if at all) by matter ex post facto; or whether a respect for vested and existing rights, falling in with the liberal spirit of the modern law of nations on this subject, (Vattel, p. 575, $ 200, p. 483, $ 76,) should turn the scale in favour of a literal adherence to the English law, and thus protect lands actually holden here by British subjects, at the time of our separation.
If such should be esteemed the correct *936 opinion, the lands of the then holders are already safe from the law of escheat and forfeiture; and the treaty therefore need not receive an extended construction in order to protect them: and as such lands are also protected from legislative confiscations, (or, in other words, acts of hostility,) by the mere conclusion of the peace, the stipulation in question need not be applied at all, to real British subjects, even in relation to lands by them holden in this country before the war.
But, however this may be, and whatever strong obligation there may be upon a sovereign to guaranty to his subjects lands held in the enemy’s country at the *time of the commencement of hostilities, and, however this circumstance might weigh in forming a construction of a treaty when such a case shall actually occur, the case is widely different in respect of future, eventual and possible acquisitions; future, I mean, in relation to the establishment of our new government, and the actual commencement of hostilities. Such is precisely the character of the case now before us; and what makes it still infinitely weaker is, that it accrued even long after the signature of the treaty of peace I! In the case of war, all civil intercourse, between the subjects of the different nations, becomes prohibited and unlawful. This was particularly the case in our revolutionary war; the statute of 16 Geo. III. on the part of Britain, and many similar acts on the part of the several states, having prohibited all but a hostile intercourse between the people of the belligerent nations. In such a state of things, therefore, there would be but few to purchase lands (in the ordinary sense of the term) in either country; and even in respect of devises and descents to British subjects, we cannot, without imputing a gross ignorance to our people, in relation to the laws of alienage, (an ignorance which could not, especially, be pretended, in this commonwealth, after the strong legislative declarations on the subject contained in the before-mentioned act of 1779,) suppose that many instances took place of devises being made, or descents permitted, to those who, in the double character of enemies and aliens, were liable to the double penalties of legislative confiscations, and municipal forfeitures on account of alienage. The permission of such vain and fruitless devises and descents, would argue great negligence and weakness on the part of our people; and we may therefore fairly conclude that cases of this class, occurring during the war, were probably few; and those, as -I have already said, possessed no strong claim on the British king to stipulate in their favour. Besides, no construction can be made, in the present instance, in favour of heirs and devisees, which will not equally operate in favour of actual ^purchasers of land here, (in the ordinary sense,) who, with their eyes open, have violated the laws, and contravened the policy of their sovereign 1 If a plaintiff of this description were now before the court, would the construction of the treaty be extended in his favour? Certainly not. But the construction must be uniform; and it is a sound rule, that in making a construction, all the consequences are to be taken into consideration. I repeat, therefore, that the cases of any of these classes were probably but few; that none of them had any strong claim upon the British king to stipulate in their favour, and that the actors in some of them actually contravened his policy and injunctions. These cases were therefore probably not contemplated nor considered in forming the treaty, or if so contemplated, were abandoned on account of the weakness of their pretensions.
But further, British subjects so claiming on any of the three grounds of descent, devise, or actual purchase, held not actual interests, with reference to the epoch of our independence, but mere possibilities of interest, (even admitting the question of alienage to be in their favour,) interests emphatically in nubibus, interests often assailed by the acts of our legislature, and reprobated by the decisions of our courts. As well might the eldest sons of our citizens complain of the destruction of the right of primogeniture, living their fathers, as these British subjects object, that long antecedent to the accruing of their claims, they were thrown into the class of aliens by the natural and necessary effect of our pre-existing municipal regulations. It was too much for the British king to ask, (were he even impelled by a strong motive,) or for our government to grant, that the rights of escheat and forfeiture, accruing during the war, should be surrendered in relation to. British subjects. Such a relinquishment, in itself, would not perhaps have been very important, had congress possessed adequate powers, but it might have carried with it the appearance of a concession, to which America would have been extremely averse; namely, that the doctrines of alien-age did not attach here till the signature of the treaty; *or, in other words, that we were not, until then, an independent . nation I With respect to such acquisitions here, after the date of the treaty, (as in the case before us,) they stand upon a still weaker ground. It would have been most unreasonable for the British king to ask, or for us to grant, in favour of mere future and possible intei'ests, that his subjects should be, in some sense, the same people with us, after we had established ourselves to be wholly independent of that nation; and that they should, without rendering us any services, or owing us any allegiance, be entitled, through all time, to important privileges in our country, which only the subjects of one or two of the most friendly and favoured nation were, at that time, permitted to enjoy. I will close this part of the subject by one general observation; and that is, that in all those of our treaties in which it was intended to yield up the laws of alienage in favour of the subjects of highly friendly and favoured nations, nay, even in the instrument of confederation itself, in relation to the citizens of the other states of the union, (see art. 4,) express, explicit, and appropriate terms are used to effect such surrender: whereas this is an attempt, under general and ambiguous expressions, (to admit the most,) to infer a surrender of *937 those laws, and to create or enlarge interests in favour of the subjects of a nation, then certainly standing at the head of those the least favoured by America, and which has not been able to obtain from us up to this day, even by the famous treaty of 1794, the boon in question, in the extent now contended for!
I have avoided, as much as possible, in this whole discussion, having reference to that treaty: (the treaty of 1794:) I must, however, here repeat my remark, that that treaty has not left vested and existing rights to rest upon the same basis with future, contingent and possible ones; and that while that treaty has guarantied, in a remarkable manner, the property in lands then actually holden in either country, it has suffered those future and possible rights, together with this famous doctrine of legitimation, to perish in the quicksands of the revolution ; lo be cast into the fathomless vortex “prepared, by that revolution, for all those parts and principles of the common law of England, which are heterogeneous to our republican institutions ! if it should even (contrary to what seems to have been decided by the supreme court of the United States, as before mentioned) be argued that that treaty protects and enlarges the null and defeasible interests acquired here by British subjects up to the time of its formation, it proves nothing in relation to the treaty of 1783, both because the present general government of the United States has powers, perhaps, competent to that purpose, and because the treaty of 1794 has used strong words to effect it; in both which important respects, the treaty of 1783 is widely different.
As the 5th article of the treaty only recommends to the several states to do what congress had no power to do absolutely, i. e. to refund money produced by confiscations, and if congress, as I contend, had no greater right to arrest property vested in the several states by their laws of alien-age, than to demand the money contemplated by the 5th article, if such arrestaiion had been contemplated by the 6th article, would not the style of recommendation have been also kept up therein? And as there is a positive interdiction of “confiscations” stipulated by that article, shall we not infer from this change of style that it relates merely to such confiscations as congress possessed an absolute right to prohibit? It may not be improper to add, that another part of the terms of the clause in question seems to favour the construction I contend for. These terms are “that there shall be no future confiscations made.” This term "'made,” seems strongly to import an active measure to effect a forfeiture, such as a legislative act, and not that kind of confiscation which is produced by the ordinary and passive operation of the law of escheat and forfeiture.
I have so far considered this case as if it were a case of forfeiture; whereas it is a right accruing to the commonwealth by way of escheat. Every thing that I have now said, to discriminate between forfeiture and confiscation, “'holds more strongly in relation to a right accruing by escheat. It is doing much more violence to the meaning of the latter term than the former, to make it synonymous with confiscation. I have also viewed it, in general, as if the descent in question had fallen prior to the date of the treaty of peace; whereas it was cast long after. Ours, therefore, is a much stronger case than that; for with respect to antecedent descents and purchases, there was some ground, or semblance of ground, for the treaty to operate upon; but, in this case, as the antenati pretension is entirely exploded, the present plaintiffs cannot recover, unless we are prepared to say that, (bating the treaty of 1794,) through all time, all British subjects, in cases like the present, are entitled to recover!!
The 4th enquiry I proposed to make under the head of the treaty, is in a great measure anticipated; I mean respecting the capacity of British subjects to sustain real actions. This right is, I think, incidental to the right to the subject. In all cases in which lands are preserved to British subjects, (for example, under the treaty of 1794,) their right to sue for them is also preserved ; and this right forms, in that case, an exception to the general doctrine of alien-age; but, on the other hand, where the principal does not exist, neither does the incident; they stand, or fall, together. While, therefore, I can never subscribe to the position, I had almost said the absurd position, taken by the plaintiffs, that all those are entitled to sue for lands here, who were so entitled at the time of their birth, under another government, of which they were then members, I can readily admit those to sue, in derogation from the general principle attaching a disability to aliens in this respect, to whom our laws or treaties have yielded a right to the subject sued for.
I have thus given to the treaty of peace a construction which outstrips and goes beyond the actual case before us. I have done this, not only because all the aspects of the case seem much involved with each other, but also for the reasons before assigned for discussing somewhat at large the pretensions of the antenati. My observations are so multifarious “and desultory, that I fear I shall not be fully understood; but I have not time to reduce them to order, nor even to recapitulate.
The construction of the treaty, which I now contend for, has been impeached, loudly impeached, as gaining nothing for the other contracting party, by merely inhibiting legislative confiscations, while it leaves free the ordinary law’s of alienage. To this objection I would answer, 1st. That that construction fully satisfies the words of the treaty, and goes the full length of the actual powers of the government of the confederation on the subject. 2dly. That it secures every thing for the refugees, whose interests were anxiously attended to by the British government in the formation of the treaty. 3dly. That it secures money and personal property to whomsoever belonging; there being no ordinary laws in any of the states to work a forfeiture of such property; and, 4thly. That if the ordinary laws of alienage can *938 not divest land actually holden here by British subjects at the time of our separation, (on which, however, I give no conclusive opinion,) my construction of the treaty abandons no claims of British subjects to lands in this country, but eventual, contingent and unlawful ones; unlawful, as being acquired at a time when they were equally interdicted by the laws, and by the actual state of things between the two countries; and that if our ordinary laws can divest such lands, (lands holden herein 1776,) it is meet that the British subjects should lose something by the war, when the Americans lost every thing. While we argue from what was incumbent upon the British king to do, on behalf of his people, we ought not to lose sight of a construction which respects the rights of the sovereign states of America, and the actual temper and situation of the times; we ought not to stickle for liberalities in favour of British subjects, when such were not the order of the day, and have not, in fact, been dealt out to us by them. It ought not, however, to be lost sight of as abridging the extent of this evil, (if it be one, and is not otherwise cured,) that in several of the states, (Pennsylvania, I am informed, *for example,) no laws imposing forfeitures on account of alienage do exist, and that, therefore, as to those states, every possible end, to be desired' in favour of British subjects, will be attained by confining the confiscations intended by the 6th article of the treaty to mean legislative confiscations merely.
I cannot dismiss this very important subject, without declaring my satisfaction to find the result of my enquiries entirely corroborated by a great authority. A production truly worthy of the pen of the author of the declaration of independence: a production which must ever rank high among the most distinguished of diplomatic dissertations: which bears the most evident marks of the most patient and laborious investigation; an essay which confounded the British minister, and put him to silence, cannot but be considered by me as a great authority. Americans can never be indifferent to a work written by Jefferson, and sanctioned by Washington. I will even bring this work into a court of justice, infinitely sooner than the obiter dicta of judges, pronounced without necessity, and founded on no deliberation. There is no magic in the name or character of judges, which will induce me to repel the ablest opinions, of the greatest men, on the most important subjects. Truth and right are my objects; and I will avail myself of all practicable means to endeavour to attain them.
Mr. Hammond, the British minister in this country, had made complaints on the very subject now before us; that is, the subject of infractions of the treaty of peace, and had invited the then secretary of state (Mr. Jefferson) to a discussion. He had complained, inter alia, of a decision, in the state of Maryland, on the subject of alienage, in the case of Harrison’s representatives. He had complained of this decision; but although he was conjuring up all the infractions of the treaty which the wit of man could invent or suggest, he did not urge it as an infraction of the 6th article, nor even, in itself, of any article of that treaty. He did not urge this decision, or any other decision, as an infraction of *that article, interdicting “future confiscations,’’ although he undoubtedly would have done so, had he concurred with the plaintiffs’ counsel in the construction they now contend for. He has come into my construction of the treaty in this instance, by confining his list of infractions of the 6th article to legislative violations only; (see his letter, p. IS, of the correspondence;) he merely complained of the decision in Harrison’s case, as establishing a principle which, taken in connexion with the laws of some of the states compelling creditors to receive lands in pajmient of their debts, infringed the 4th article of the treaty guarantying the bona fide payment of British debts. He complained that the 4th article of the treaty was infringed, or eluded, by compelling British subjects to receive lands in payment, while the decisions on the laws of alienage, did not permit them to hold such lands, (ibid. p. 12.) This, then, seems to be the extent of his complaint on this head. Be that matter, however, as it may, the secretary of state obtained from the senators and delegates of the state of Maryland, in congress, the following statement in relation to that case of Harrison’s representatives, viz. “on the disclosure of facts made by the trustees of the will of Harrison, upon oath, in chancery, in consequence of the claim made by the attorney general, in behalf of the state, the chancery court determined it in behalf of the state, it is believed, on this principle, that however Great Britain might consider the antenati as subjects born, and that they could not divest themselves of inheritable qualities, yet, that the principle did not reciprocate on America, as those antenati of Great Britain could never be considered as subjects born of Maryland. The legislature, however, took the matter up, and passed an act relinquishing an3 right of the state, and directing the intention of the testator to take effect, notwithstanding such right. It is conceived that this was a liberal and voluntary act, on the part of the legislature, in behalf of Harrison’s representatives, who are at liberty to pursue their claim.” Documents, p. 96.
Mr. Jefferson, the secretary, taking up this case, upon the above report, observes: “The case of Harrison’s representatives, in the court of chancery of Maryland, is in the list of infractions. These representatives being British subjects, and the laws of this country, like those of England, not permitting aliens to hold lands, the question was, whether British subjects were aliens. They declared that they were; consequently, that they could not ta.ke lands; and, consequently, also, that the lands in this case escheated to the state. Whereupon the legislature immediately interposed, and passed a special act, allowing the benefits of succession to the representatives. But had they not relieved them, the case would not *939 have come under the treaty, as there is no stipulation in that, doing away the laws of alienage, and enabling the members of each nation to inherit or hold lands in the other.” Jefferson's letter, p. 36.
I conclude, sir, as the best result of my judgment, that the law of this case is in favour of the defendant, and that the judgment of the district court should be affirmed.
FLEMING, Judge, CARRINGTON, Judge, and LYONS, President,
were of opinion, that the appellants were incapable of inheriting from Robert Read, at the time of his death.
That, by the general rule of law, none can succeed as heirs to land, but those who are citizens, and owe allegiance to the government, at the time the descent is cast; and that the plea of alien born is a complete bar in a real action, until it is disproved ; or some act of naturalization is produced. 7 Co. 16; Vaugb. 278.
That; both by the civil, and the common, law, those born m another country, and not naturalized in our own, are aliens, 2 Dom. 360; 7 Co. 16: and that idea is adopted, as well in the acts of the state legislature, as in those of congress.
That alienage therefore, was a fatal exception to the claim of the appellants. For the revolution dissolved the connexion between the two countries : and, by that event, the ^states, on this side the Atlantic, became newly created sov-ereignties; to which, allegiance could not be due prior to their commencement as independent governments. That Calvin’s case supported these principles; for the decision there proceeded on the ground, that the claimant was born after the union of the crowns; and consequently under the ligeance of one who had become sovereign of both countries. The words of the court were, that ‘ ‘the time of the birth is of the essence of a subject born ; for he cannot be a subject of the king of England, unless at the time of his birth, he was under the ligeance and obedience of the king. And that is the reason that antenati in Scotland, (for that, at the time of their birth, they were under the ligeance and obedience of another king,) are aliens born, in respect of the time of their birth. But, as Calvin was born under one natural ligeance and obedience, due by the law of nature to one sovereign, he was a natural born subject.” 7 Co. 18, b. 25, b. Which was not affected by what was afterwards said, (fol. 27,) relative to a division of the kingdom. For although the antenati might, by fiction, possibly, be regarded as subjects of the first sovereign, the reverse could never be admitted ; because the antenati, within the dominions of the first sovereign, would not be born under the ligeance of the new king; and therefore they would be aliens to him, upon the same ground, that those born under the ligeance of James, as king of Scotland, were aliens to him as king of England.
That this was precisely the situation of the antenati of Great Britain with respect to the United States; for although they were born under a sovereign common to both countries at the time, yet they were not born under the ligeance of the newly created governments here, and consequently are aliens to them.
That neither of the treaties varied the case. Not the treaty of peace; because that was intended to secure to former fellow subjects, whom the division of the empire had separated from each other, the property which reciprocally *belonged to them at the date of the treaty ; and which might possibly have been endangered, on both sides, by the renunciation of allegiance by one of the parties, and the relinquishment of it by the other. Not the treaty of London; because that was only intended to secure to actual owners the lands belonging to them at its date, without any retrospective operation as to those which had been completely lost before.
That the result was, that the appellants, who were neither born within the United States, nor were ever admitted to citizenship here, could not recover; for they had not capacity to take by descent in October 1787, when Robert Read died; and they were not embraced within the treaty of London in 1794, as the land had been ante-cedently lost.
That, therefore, the judgment of the district court was right, and ought to be affirmed.

By Judge Tucker,

 judge Pendleton.